**Oscar John HUGUEZ, Appellant,**

v.

**UNITED STATES of America,
Appellee.**

**No. 21518.**

United States Court of Appeals
Ninth Circuit.

Sept. 30, 1968.

Rehearing En Banc Denied
Feb. 12, 1969.

John H. Ely (argued), San Diego, Cal., for appellant.

Phillip Johnson (argued), Asst. U. S. Atty., Edwin Miller, U. S. Atty., San Diego, Cal., for appellee.

Before BARNES and ELY, Circuit Judge, and HAUK,* District Judge.

HAUK, District Judge:

Here raised in this appeal is an issue which is coming before this and other Federal Appellate Courts with increasing frequency—the validity and constitutionality of border searches conducted without a search warrant by forcible and intrusive invasion of an intimate human body cavity. In this case the appellant's rectum was searched by forcible digital insertion and manipulation in locating and extracting four narcotic packets which were seized and introduced in evidence at appellant's trial.

This issue necessarily raises the questions of "reasonableness" of the search and seizure under the Fourth Amendment to the United States Constitution [1] and

---

\* Hon. A. Andrew Hauk, United States District Judge, Central District of California, Los Angeles, California, sitting by designation.

1. U.S.Const. Amend. IV:
"ARTICLE [IV]
The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

the permissibility of the techniques used under the "due process" clause of the Fifth Amendment.[2]

Appellant Huguez (with a codefendant alleged to have aided and abetted him) was charged in two counts of a four-count indictment with knowingly importing four ounces of heroin into the United States from Mexico, and with concealing and transporting it in violation of 21 U.S.C. § 174.[3] The third and fourth counts, charging the codefendant and ap-

pellant respectively with failing to register as narcotics addicts or users upon entry into the United States, in violation of 18 U.S.C. § 1407,[4] were both dismissed upon motion of the Government.[5]

On the day of trial in the District Court, Southern District of California, May 26, 1966, appellant filed a motion to suppress the use of the heroin in evidence, pursuant to Rule 41(e), Fed.R. Crim.P., supporting it with his affidavit

2. U.S.Const. Amend. V:

"ARTICLE [V]
No person shall be * * * deprived of life, liberty, or property, without due process of law."

3. 21 U.S.C. § 174:

"§ 174. *Same; penalty; evidence*
Whoever fraudulently or knowingly imports or brings any narcotic drug into the United States or any territory under its control or jurisdiction, contrary to law, or receives, conceals, buys, sells, or in any manner facilitates the transportation, concealment, or sale of any narcotic drug after being imported or brought in, knowing the same to have been imported or brought into the United States contrary to law, or conspires to commit any of the such acts in violation of the laws of the United States, shall be imprisoned not less than five or more than twenty years and, in addition, may be fined not more than $20,000. For a second or subsequent offense (as determined under Section 7237(c) of the Internal Revenue Code of 1954), the offender shall be imprisoned not less than twenty or more than forty years and, in addition, may be fined not more than $20,000."

4. 18 U.S.C. § 1407:

" § 1407. *Border crossings —narcotic addicts and violators*
(a) In order further to give effect to the obligations of the United States pursuant to the Hague convention of 1912, proclaimed as a treaty on March 3, 1915 (38 Stat. 1912), and the limitation convention of 1931, proclaimed as a treaty on July 10, 1933 (48 Stat. 1571), and in order to facilitate more effective control of the international traffic in narcotic drugs, and to pre-

vent the spread of drug addiction, no citizen of the United States who is addicted to or uses narcotic drugs, as defined in section 4731 of the Internal Revenue Code of 1954, as amended (except a person using such narcotic drugs as a result of sickness or accident or injury and to whom such narcotic drug is being furnished, prescribed, or administered in good faith by a duly licensed physician in attendance upon such person, in the course of his professional practice) or who has been convicted of a violation of any of the narcotic or marihuana laws of the United States, or of any State thereof, the penalty for which is imprisonment for more than one year, shall depart from or enter into the United States, unless such person registers, under such rules and regulations as may be prescribed by the Secretary of the Treasury with a customs official, agent, or employee at a point of entry or a border customs station. Unless otherwise prohibited by law or Federal regulation such customs official, agent, or employee shall issue a certificate to any such person departing from the United States; and such person shall, upon returning to the United States, surrender such certificate to the customs official, agent, or employee present at the port of entry or border customs station.

(b) Whoever violates any of the provisions of this section shall be punished for each such violation by a fine of not more than $1,000 or imprisonment for not less than one nor more than three years, or both."

5. RT 24, 134. Reference is made to Reporter's Transcript, referred to as "RT", which is Volume II of the Transcript of Record herein and which contains the oral proceedings in the District Court.

and claiming that the heroin was inadmissible because: [6]

(a) It was seized without a search warrant;

(b) The heroin was seized in an "unreasonable" search which was constitutionally invalid; and

(c) The heroin was obtained by the use of methods and techniques violative of "due process".

This motion was impliedly overruled throughout the trial when the Court permitted the introduction of the heroin into evidence and at the end of the trial was formally denied.[7]

After the nonjury trial, the appellant was found guilty of the offenses charged in the first two counts; the Government agreed to and later did dismiss count three as to the codefendant,[8] and count four as to appellant.[9]

A seven-year sentence was then imposed upon appellant on each of the two counts, to be served concurrently.

Jurisdiction below rested on 18 U.S.C. §§ 1407 [10] and 3231,[11] and 21 U.S.C. § 174.[12] Our jurisdiction is established by 28 U.S.C. §§ 1291 [13] and 1294.[14]

The substantive error urged on this appeal is the denial of the motion to suppress and the subsequent admission into evidence of the four ounces of heroin seized in the intrusive search of appellant's rectum. We find that the specification of error is well taken because readily apparent upon close analysis of the facts contained in the record, considering the evidence in the light most favorable to the Government, as we are obliged to do, and disregarding only such testimony as shown by the whole record to be palpably unworthy of belief.

A careful reading of the Transcript of Record in this case leads us chronologically and inevitably to a four-step summary of what occurred from the beginning of the border crossing through the naked strip and skin search on to the final forcible intrusion of the rectal cavity:

1. The border crossing and initial detention by Inspector Teela;

2. The secondary area examination and strip and skin search by Inspectors Teela and Lasher;

3. The forcible and intrusive rectal cavity invasion by Dr. Salerno and the three customs agents—Gates, Maxcy and Spohr.

4. The absence of any emergency or compelling urgency.

---

6. CT 13–25. Reference is made to Clerk's Transcript, referred to as "CT", which is Volume I of the Transcript of Record herein and which consists of the Indictment and other pleadings.

7. RT 134.

8. RT 24, 140.

9. RT 134.

10. See note 4, supra.

11. 18 U.S.C. § 3231:
 "§ 3231. *District courts*
 The district courts of the United States shall have original jurisdiction, exclusive of the courts of the States, of all offenses against the laws of the United States.
 Nothing in this title shall be held to take away or impair the jurisdiction of the courts of the several States under the laws thereof."

12. See note 3, supra.

13. 28 U.S.C. § 1291:
 "§ 1291. *Final decisions of district courts*
 The courts of appeals shall have jurisdiction of appeals from all final decisions of the district courts of the United States, the United States District Court for the District of the Canal Zone, the District Court of Guam, and the District Court of the Virgin Islands, except where a direct review may be had in the Supreme Court."

14. 28 U.S.C. § 1294:
 "§ 1294. *Circuits in which decisions reviewable*
 Appeals from reviewable decisions of the district and territorial courts shall be taken to the courts of appeals as follows:
 (1) From a district court of the United States to the court of appeals for the circuit embracing the district."

## I. THE FACTS

### 1. *The Border Crossing and Initial Detention by Inspector Teela.*

At 8:50 p. m. on the evening of May 13, 1966, appellant Huguez and a companion, codefendant Baros, attempted to enter the United States at the San Ysidro border crossing, San Diego County, California, after traveling by automobile from Tijuana, Baja California, Mexico.[15] At the primary inspection point, Customs Inspector Thomas N. Teela approached the automobile and engaged the two men in routine border questioning.[16]

Huguez responded to the questions by stating that he was a citizen of the United States, had been born in Los Angeles, California, and was bringing in some mascara which he had purchased for his wife in Mexico.[17] He declared this merchandise but did not declare any narcotics, nor did he register as a narcotic addict or user under 18 U.S.C. § 1407,[18] nor did he present any registration certificate as required by this statute.[19]

Nonetheless, Inspector Teela became "somewhat suspicious" that the two men were under the influence of narcotics when he observed, with the aid of the fluorescent lighting in the inspection area and a flashlight which he focused upon the men during the inquiry, that their eyes appeared to be "glassy and pinpointed".[20]

During the trial, Inspector Teela admitted on cross examination that, since he had not seen either of the men on any previous occasion and was not trained or experienced in medical matters, he had "no way of knowing" the normal size of their pupils nor the reflective effect that fluorescent lighting and flashlights would have upon their eyes.[21]

On this basis Teela reached the conclusion that appellant and codefendant Baros were under the influence of narcotics, and thereupon entered the passenger side of the automobile and directed the suspects to proceed to the secondary area.[22]

### 2. *The Secondary Area Examination and Strip and Skin Search by Inspectors Teela and Lasher.*

Inspector Teela escorted the suspects to the secondary area where the windowless search rooms are located, and after entering one of the rooms Huguez was instructed to take off his clothes.[23] With the assistance of Supervisor Inspector Lasher, Teela then conducted a personal clothing and skin search of the naked Huguez and later of the codefendant Baros. The strip and skin search failed to produce narcotics or other contraband, but did reveal what Lasher said was the presence of "needle marks on their arms" as well as what Teela said was a "greasy substance" on appellant's buttocks.[24]

Inspector Lasher subsequently turned the two men over to Assistant Customs Agent-in-Charge Walter A. Gates and Customs Agent John D. Maxcy.[25] Gates was informed by Inspector Lasher only of the needle marks on the suspects' arms and, for some reason not at all apparent, Teela failed to say anything at all to either Gates or Maxcy about:

(1) the "greasy substance" he had allegedly observed on Huguez's buttocks;

(2) the United States citizenship of Huguez and his failure to register or present a certificate as a narcotic user or addict under 18 U.S.C. § 1407; or

(3) the "glassy and pinpointed eyes".

15. R.T 76, 108.

16. R.T 76, 77, 80.

17. R.T 77, 80, 108–109.

18. See note 4, supra.

19. R.T 77.

20. R.T 78, 81.

21. R.T 81, 82.

22. R.T 78, 82.

23. R.T 78–79, 110–111.

24. R.T 90, 79.

25. R.T 88–89.

Nor did Teela, Lasher or anyone else suggest to Gates that the doctor examine the appellant.[26]

3. *The Forcible and Intrusive Rectal Cavity Invasion by Dr. Salerno and the Three Customs Agents—Gates, Maxcy and Spohr.*

Agents Gates and Maxcy took the two men, now fully dressed again, from the windowless search room to the baggage area across the street and into one of the rooms in this baggage area [27]—*not* a *medical* room nor even a room, so far as the record discloses, equipped with any of the usual hygienic and sterilized equipment found in the physician's customary office, but evidently only a bare *baggage* room with "an examination table" in it.[28] Dr. Paul R. Salerno proceeded to examine codefendant Baros and then appellant Huguez,[29] while Inspector Lasher leaned against the wall watching the proceedings.[30] Neither Agent Gates, nor Agent Maxcy, nor Inspector Lasher, nor anyone else passed on to Dr. Salerno any information about the physical condition of Huguez and Baros. The doctor was *not* told of the "glassy and pinpointed eyes" which Teela claims made him "somewhat suspicious"; *nor* of the "needle marks" which Lasher had noticed; *nor* of the alleged "greasy substance" that Teela claims he saw on Huguez's buttocks.[31] And the record does not show that the doctor was ever told that Huguez was a United States citizen and had not regis-tered or presented a narcotic user. or addict registration certificate under 18 U.S.C. § 1407.

Yet, starting from scratch, without a search warrant, which it is clear (and the Government admits) was not issued or served, without any prior information of any kind whatsoever, Dr. Salerno took it upon himself to conduct the forcible body and intrusive rectal cavity invasion to locate and extract the four packets which were later introduced in evidence at the trial and are now the basis of appellant's contention of reversible error.

After appellant had removed his shirt as directed, Dr. Salerno then for the first time became aware of the small needle marks on Huguez's arms which, according to the doctor's testimony, suggested that Huguez had recently used narcotics.[32] During the examination, Dr. Salerno also concluded that Huguez's pupils responded sluggishly to darkness, that the deep tendon reflexes of the lower extremity were hyperactive, and that his pulse rate was accelerated. On the basis of this examination, and admittedly having failed to administer either one of the ordinary and easily given Nalline or urine tests, the doctor arrived at the opinion that Huguez was a user and at that time under the influence of narcotic drugs.[33] And after arriving at this opinion the doctor made the request "to conduct a routine digital or rectal examination".[34]

---

26. RT 89–90.

27. RT 89.

28. RT 49. We note that while Dr. Salerno referred to this room as "an examination room" (RT 31) and Agent Gates called it "the doctor's office" (RT 49), it was still nothing more than a bare room in the baggage area with an "examination table" as the only medical equipment. RT 49.

29. RT 30, 89.

30. RT 92.

31. RT 89–90.

32. RT 112, 31, 52.

33. RT 31–33, 52.

34. Direct examination of Dr. Salerno, RT 33:
 "Q. After arriving at that opinion, sir, did you do anything else in connection with this defendant Mr. Huguez?
 "A. After the opinion was made that he was under the influence of a narcotic drug and he was a user of narcotic drugs, the request was made to conduct a routine digital or rectal examination to determine the presence or absence of any concealed material in the rectal cavity."
 Direct examination of Agent Gates, RT 90:
 "Q. Had anyone suggested to you, Mr. Gates, that the doctor examine this defendant?
 "A. No one suggested to me, no, sir."

Thereupon Huguez was ordered to lower his trousers so that Dr. Salerno could conduct a digital rectal probe to determine whether any material was concealed in the anal cavity,[35] despite the fact that the doctor had not received any information at all from the agents or from anyone else regarding the "greasy substance" that Teela claimed he saw on Huguez's buttocks.[36] As we have said, he gave this order to Huguez to lower his trousers and began the rectal cavity invasion without a search warrant of any kind having been sought, issued or served.

Upon Huguez's refusal to lower his trousers, Dr. Salerno told him "We're going to have to do it the hard way." Whereupon the three customs agents—Gates, Maxcy and Spohr—forcibly pulled Huguez's pants down.[37]

Dr. Salerno then started his "digital or rectal examination" by using a plastic glove and inserting his index finger up Huguez's anus and into his rectum.[38] Parenthetically we note, and it is a curious circumstance indeed, that when Dr. Salerno examined Huguez's buttocks and rectal area prior to inserting his finger, he found absolutely no evidence of the "greasy substance" which Teela claimed he saw. In fact, the doctor testified that there was no "foreign chemical substance" or "lubrication" in the rectal and buttock area at all. And he so testified both on direct and on cross examination.[39] Incidentally, Huguez also testified that there was no "greasy substance" on or in the area of his buttocks.[40]

As the doctor's finger was inserted, Huguez did not at first physically resist,[41] but when the doctor persisted in the digital manipulation, Huguez vehemently protested:

"I told him that I wasn't going to relax, that he was just running over my constitutional rights. He couldn't go up my rectum without my consent."[42]

And then Huguez began to resist with all the strength he could muster. As Dr. Salerno put it, "he forcibly constricted his external sphincter; he also reached around with one of his hands in an effort to remove my finger from the examining position."[43] And he continued his struggling resistance against the combined efforts of at least three agents there in the room with Dr. Salerno.[44]

At this critical juncture of the struggle, the agents handcuffed Huguez and threw him onto a table.[45] Agent Gates was then able to break Huguez's will to resist by pulling forward on the handcuffs and exerting enough pressure on Huguez's head, shoulders and back to keep him bending over forward and forcing his chest to remain on the table.[46] Gates said Huguez's hands were cuffed behind his body and were pulled up and forward to force his upper body prone on the table,[47] while Huguez claimed he was cuffed with his hands and arms in front.[48] In any event, sufficient pressure was exerted to bring Huguez against the table and flat down on it from hips to head.[49]

Agent Gates admitted having noticed "red streaks" on Huguez's wrist following his protests that the handcuffs were

35. RT 112, 33.

36. RT 89–90.

37. RT 112. Dr. Salerno was equivocal on this point, first testifying that "the pants were lowered" and later testifying that "he lowered his trousers." RT 50.

38. RT 33.

39. RT 41, 70.

40. RT 114–115.

41. RT 49–51.

42. RT 113.

43. RT 62.

44. RT 62–63, 66, 93–95, 112–114.

45. RT 112.

46. RT 62, 68–69, 90–91, 93–94.

47. RT 92–93.

48. RT 112.

49. RT 93, 112–113.

applied too tightly.[50] Huguez elaborated that the continuous pulling on the handcuffs caused "metal to bite into the flesh" and "the skin was peeled", resulting in "cuts on my wrists".[51] And Agent Spohr admitted that he observed at least "a red spot on the one wrist." [52]

While Agent Gates pulled on the handcuffs to control the shoulders and head area, the other officers were applying pressures to the rest of Huguez's body.[53] Agent Maxcy controlled the small of his back in pressing down with arms and hands. Huguez's legs were stretched and pulled apart by Agent Spohr who controlled Huguez's left leg with the weight of his own right leg, and by Dr. Salerno who controlled Huguez's right leg with his own right arm.[54] Eventually the agents succeeded in breaking appellant's resistance and Dr. Salerno was finally able to extract the four large spherical packets, each measuring approximately one to one and one-half inches in diameter which, with the doctor's finger, constituted in each case a mass of approximately two inches in diameter when being removed from the rectal cavity through the anus and external sphincter, requiring a stretching of the sphincter.[55] The packets were later determined and stipulated to contain four ounces of the narcotic, heroin.[56]

This "force process", as Agent Gates characterized it, took about five minutes, although the appellant declared it was something more like ten, fifteen or twenty minues.[57] Needless to say, this "force process", simultaneously applied by the three custom agents in restraining Huguez and by Dr. Salerno in locating and removing the packets, caused the appellant considerable discomfort and pain.[58] Throughout it all, Huguez's pleas and protestations went unheeded. "I told them to stop. It was hurting. And they just laughed * * * They just made like a wisecrack out of it." [59] And throughout it all, the appellant was never put under arrest.

### 4. The Absence of Any Emergency or Compelling Urgency.

Dr. Salerno's testimony clearly revealed that there was no emergency necessitating or justifying the brutal "force process" to which Huguez was subjected in the conduct of the intrusive rectal cavity invasion. According to Dr. Salerno, it is entirely possible for a person to retain packets of heroin within the rectal cavity for a period of several days even though some degree of discomfort might be experienced during that period.[60] Moreover, according to the doctor, the frequency of a normal bowel movement is about once a day and the administration of an oral laxative ordinarily would entail a waiting period of no more than six or eight hours.[61] And finally the doctor agreed that even though the rubber balloon material with which the packets were covered might eventually deteriorate and cause some health hazard to Huguez, possibly even death upon direct contact and absorption by the rectal cavity, there would be no such hazard for at least six to eight hours.[62] The inference is clear, then, that no emergency or com-

---

50. RT 90.

51. RT 116.

52. RT 103.

53. RT 94.

54. RT 92, 94, 104–105, 69.

55. RT 34, 40, 60, 65.

56. RT 36–37.

57. RT 94, 113.

58. RT 114, 116, 39.

59. RT 114, 118. It should be noted that Agent Gates did not categorically deny that laughter occurred, but merely stated that he did not "recall" hearing anybody laugh. RT 123.

60. RT 43–44.

61. RT 43–44.

62. RT 42–43. Whether this six to eight hour period runs from the moment of insertion or the time of his examination, Dr. Salerno did not say. In either event, since it is reasonable to assume that the insertion was made immediately prior to the border crossing, there was no emergency.

pelling urgency existed for at least a six to eight hour period during which the government agents could have obtained the issuance and service of a search warrant.

## II

## THE INTRUSIVE INVASION OF APPELLANT'S RECTAL CAVITY EXCEEDS THE CONSTITUTIONAL LIMITATIONS OF THE FOURTH AMENDMENT ON BORDER SEARCHES WITHOUT A WARRANT, BECAUSE THERE WAS NO "CLEAR INDICATION" THAT THE CAVITY CONTAINED NARCOTICS.

No constitutional right is more basic or fundamental than the right of privacy, protected by the Fourth Amendment restriction against "unreasonable searches and seizures" which violate "the right of the people to be secure in their persons, houses, papers and effects." Boyd v. United States, 116 U.S. 616, 6 S. Ct. 524, 29 L.Ed. 746 (1886).

In its historical and inevitable development, this constitutional right has been enforced by exclusion of evidence obtained illegally in contravention of the Fourth Amendment.[63]

With scientific advances and the development of the telephone and electronic gear, the Supreme Court has been zealous to protect this right against invasions by wiretapping[64] and electronic eavesdropping.[65]

Our Ninth Circuit has summed it up: "The Fourth Amendment protects against invasion of the right of privacy. To effectuate this basic purpose and policy, the prohibitory language has been implemented by the Federal exclusionary rule. Evidence illegally obtained in contravention of the Fourth Amendment is inadmissible in a federal prosecution." Blackford v. United States, 247 F.2d 745, 748 (9th Cir. 1957).

Pointing out that the Fourth Amendment has a rich heritage and that "its genesis lies in the fervent discontent aroused in the American colonies in the period antedating the Revolution by the flagrant abuses of 'writs of assistance' ", the Court added: "It represents recognition and embodiment in our fundamental framework of government of the precept that a man's property and person

---

63. Weeks v. United States, 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914): exclusion in Federal court prosecutions of evidence obtained by federal officers through unreasonable searches and seizures.

Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961): similar exclusion in state prosecutions.

64. Olmstead v. United States, 277 U.S. 438, 48 S.Ct. 564, 72 L.Ed. 944 (1927) where Mr. Justice Brandeis in his famous dissent, which later became the majority rule in the *Nardone* cases [Nardone v. United States], 302 U.S. 379, 58 S.Ct. 275, 82 L.Ed. 314 (1937) and 308 U.S. 338, 60 S.Ct. 266, 84 L.Ed. 307 (1939), passionately proclaimed:

"They (the Fourth and Fifth Amendments) conferred, as against the government, the right to be left alone—the most comprehensive of rights and the right most valued by civilized men. To protect that right, every unjustifiable intrusion by the government upon the privacy of the individual, whatever the means employed, must be deemed

a violation of the Fourth Amendment. And the use, as evidence in a criminal proceeding, of facts ascertained by such intrusion must be deemed a violation of the Fifth." (277 U.S. at 478, 48 S.Ct. at 572)

65. Berger v. State of New York, 388 U.S. 41, 87 S.Ct. 1873, 18 L.Ed.2d 1040 (1967), per Mr. Justice Clark:

"The law, though jealous of individual privacy, has not kept pace with these advances in scientific knowledge. This is not to say that individual privacy has been relegated to second-class position for it has been held since Lord Camden's day that intrusions into it are 'subversive of all the comforts of society.' Entick v. Carrington, 19 How.St.Tr. 1029, 1066 (1765)." (388 U.S. at 49, 87 S.Ct. at 1878)

Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), per Mr. Justice Stewart: "For the Fourth Amendment protects people, not places." (389 U.S. at 351, 88 S.Ct. at 511.)

are inviolable to search except upon due cause." *Blackford,* supra, at 748.

 Just last year this Court distilled the essence of the Fourth Amendment by quoting the Supreme Court in Schmerber v. State of California, 384 U. S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966) [66] and concluding: "The decision emphasizes that the purpose of the Fourth Amendment is 'to protect personal privacy and dignity against unwarranted intrusion by the state'. To us, this means that every search must be examined in the light of the Amendment's requirement that it not be 'unreasonable'. *And we think that this requirement applies to border searches."* (Emphasis added.) Henderson v. United

States, 390 F.2d 805, 807. (9th Cir. 1967).

We are indeed mindful that, as so aptly put in *Blackford,* supra, 247 F.2d 745 at 751:

"There is no slide-rule formula yet devised for ascertaining whether specific conduct is or is not reasonable. Each case must turn on its own relevant facts and circumstances. United States v. Rabinowitz, supra; Harris v. United States, 331 U.S. 145, 150, 67 S.Ct. 1098, 91 L.Ed. 1399; Go-Bart Importing Co. v. United States, 282 U.S. 344, 357, 51 S.Ct. 153, 75 L.Ed. 374. 'Reasonableness is in the first instance for the District Court to determine.' United States v. Rabino-

**66.** Henderson v. United States, 390 F.2d 805, 807 (9th Cir. 1967):

"The overriding function of the Fourth Amendment is to protect personal privacy and dignity against unwarranted intrusion by the State. In *Wolf* [Wolf v. People of State of Colorado, 338 U.S. 25, 69 S.Ct. 1359, 93 L.Ed. 172] we recognized '[t]he security of one's privacy against arbitrary intrusion by the police' as being 'at the core of the Fourth Amendment' and 'basic to a free society.' 338 U.S. at 27, 69 S.Ct. 1359. We reaffirmed that broad view of the Amendment's purpose in applying the federal exclusionary rule to the States in Mapp."

\* \* \* \* \*

"That Amendment expressly provides that '[t]he right of the people to be secure in their *persons*, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated \* \* \*.' (Emphasis added.) It could not reasonably be argued, and indeed respondent does not argue, that the administration of the blood test in this case was free of the constraints of the Fourth Amendment. Such testing procedures plainly constitute searches of 'persons,' and depend antecedently upon seizures of 'persons' within the meaning of that Amendment." [384 U.S. at 767, 86 S.Ct. at 1834.]

\* \* \* \* \*

"We begin with the assumption that once the privilege against self-incrimination has been found not to bar com-

pelled intrusions into the body for blood to be analyzed for alcohol content, the Fourth Amendment's proper function is to constrain, not against all intrusions as such, but against intrusions which are not justified in the circumstances, or which are made in an improper manner. In other words, the questions we must decide in this case are whether the police were justified in requiring petitioner to submit to the blood test, and whether the means and procedures employed in taking his blood respected relevant Fourth Amendment standards of reasonableness." [384 U.S. at 768, 86 S.Ct. at 1834.]

\* \* \* \* \*

"The interests in human dignity and privacy which the Fourth Amendment protects forbid any such intrusions on the mere chance that desired evidence might be obtained. In the absence of a clear indication that in fact such evidence will be found, these fundamental human interests require law officers to suffer the risk that such evidence may disappear unless there is an immediate search." [384 U.S. at 769–770, 86 S.Ct. at 1835.]

See also Camara v. Municipal Court, 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967), where Mr. Justice White summarized: "The basic purpose of this Amendment, as recognized in countless decisions of this Court, is to safeguard the privacy and security of individuals against arbitrary invasions by governmental officials." (387 U.S. at 528, 87 S.Ct. at 1731)

witz, 339 U.S. 56 at page 63, 70 S.Ct. 430 at page 434, 94 L.Ed. 653. The determination by that court of a constitutional question is not binding upon us, but is entitled to weight."

■ Along with Blefare v. United States, 362 F.2d 870, 871 (9th Cir. 1966), we "accept the principle that the reasonableness of the search is, in the first instance, a substantive determination to be made by the trial court from the facts and circumstances of the case. Ker v. State of California, 374 U.S. 23, 33, 83 S.Ct. 1623, 10 L.Ed.2d 726 (1963)."

However, we note that when the trial court here in *Huguez* made its determination on May 26, 1966—the date of the one-day nonjury trial—holding the intrusive invasion of appellant's rectal cavity a "reasonable search", the opinion in *Blackford* (July 10, 1957) [67] was the only effectively determinative decisional authority in either the Ninth Circuit or the Supreme Court. Since that date, the cases of *Blefare* (June 8, 1966),[68] *Schmerber* (June 20, 1966),[69] *Rivas* (November 8, 1966) [70] and *Henderson* (July 7, 1967) [71] have laid down additional guidelines unavailable to the District Court at the time of the *Huguez* trial, but now controlling and imperative upon us.

It is, therefore, our duty to test the facts of the *Huguez* intrusive body cavity invasion, not only by the earlier exposition of Blackford, but by the more recent teachings.

In doing so, and without any implication of criticism of the learned trial judge, we find that the intrusive search of appellant's rectum here in *Huguez* exceeded the constitutional limitations of the Fourth Amendment.

Parenthetically, we should add that we "take judicial notice of the fact that the Mexico-California border is one of the major centers for importation of narcotic drugs into the United States" and of the continuing increase, to what is now virtually a common practice, of the use of body cavities by experienced smugglers to transport narcotics across the Mexican border. Blackford, supra, 247 F.2d at 752. Not only does other decisional literature to date so advise us,[72] but we also find here in *Huguez*, testimony that between July 1, 1965 and May 26, 1966, there were approximately 20 reported instances in which narcotics had been recovered from body cavities (rectums or vaginas) in border searches at the San Ysidro, California, crossing into the United States from Tijuana, Mexico.[73]

That this common practice makes effective border patrol difficult is undeniable. Yet that it must be curbed within the confines of the Fourth Amendment prohibition against unreasonable searches and seizures is unassailable.

The most recent decision of this Ninth Circuit agrees "that this presents a serious problem of law enforcement, to be weighed against the individual's right to human dignity and privacy as protected by the Fourth Amendment." Henderson v. United States, 390 F.2d 805, 808 (9th Cir. 1967). In the words of *Henderson* at 806–807:

"This court has repeatedly upheld border searches of body cavities [1][74] in-

---

67. Blackford v. United States, 247 F.2d 745 (9th Cir. 1957).

68. Blefare v. United States, 362 F.2d 870 (9th Cir. 1966).

69. Schmerber v. State of California, 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966).

70. Rivas v. United States, 368 F.2d 703 (9th Cir. 1966), cert. den. 386 U.S. 945, 87 S.Ct. 980, 17 L.Ed.2d 875 (1967).

71. Henderson v. United States, 390 F.2d 805 (9th Cir. 1967).

72. Denton v. United States, 310 F.2d 129, 132 (9th Cir. 1962); Blefare v. United States, 362 F.2d 870, 874, 885 (9th Cir. 1966); Henderson v. United States, 390 F.2d 805, 808 (9th Cir. 1967); and cases therein cited.

73. RT 122.

74. "Blackford v. United States, 9 Cir., 1957, 247 F.2d 745 (male, rectum); In re Woods, 9 Cir., 1957, 249 F.2d 614, denying certificate of probable cause in Application of Woods, N.D. Cal. 1957, 154

cluding such searches carried out in spite of the violent resistance of the person searched.[2][75] However, for reasons that will appear, we do not reach such issues here. The only question we decide is whether initiation of the search was lawful.

"We have repeatedly said that a border search can be undertaken without probable cause.[3][76] but we have also held that even in such cases, the officers must act reasonably.[4][77] Our recent decision in Rivas v. United States, supra, n. 1 [74] establishes that in the case of a search of body cavities, ' "there must be a clear indication of the possession of narcotics," ' or a 'plain suggestion' of the smuggling, which must be 'over and beyond "a mere suspicion." '[5][78] Rivas requires, when body cavities are searched, something more than was required in the earlier decisions, which said that 'mere suspicion' is enough.[6][79] The Rivas requirement is based upon language used by the Supreme Court in Schmerber v. State of California, 1966, 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908."

■■ Recognizing as too well established to require citation of authority that border searches are different from other searches, that they are unique, that the mere fact a person is crossing the border is sufficient cause for a search of his baggage, vehicle and contents of purse, wallet or bags, Henderson then lays down the restrictions that must govern a naked strip and skin search and an intrusive body cavity invasion:

"If, however, the search of the person is to go further, if the party, male or female, is to be required to strip, we think that something more, at least a real suspicion, directed specifically to that person, should be required. And if there is to be a more than casual examination of the body, if in the course of the search of a woman there is to be a requirement that she manually open her vagina for visual inspection to see if she has something concealed there, we think that we should require more than a mere suspicion. Surely, to require such a performance is a serious invasion of personal privacy and dignity, and so unlawful if 'unwarranted'. Surely, in such a case, to be warranted, the official's action should be backed by at least the 'clear indication', the 'plain suggestion', required in Schmerber and Rivas." (390 F.2d at 808).

As in Henderson, we, too, believe that the Schmerber-Rivas test should be applied to the rectal cavity invasion here in Huguez and for the same reasons, namely, we take judicial notice that many thousands of men and women crossed the California-Mexico border during the same year's period during which the record discloses there were 20 reported instances of recovery of narcotics from rectums or vaginas; that the vast majority were obviously not carrying narcotics in their body cavities or

---

F.Supp. 932 (male, rectum) ; Murgia v. United States, 9 Cir. 1960, 285 F.2d 14 (male, rectum) ; Denton v. United States, 9 Cir., 1962, 310 F.2d 129 (male, rectum) ; Blefare v. United States, 9 Cir., 1966, 362 F.2d 870 (male, stomach) ; Rivas v. United States, 9 Cir., 1966, 368 F.2d 703 (male, rectum) ; see also King v. United States, 5 Cir., 1958, 258 F.2d 754, affirming United States v. Michel, S.D.Texas, 1957, 158 F.Supp. 34 (male, stomach). Cf. Witt v. United States, 9 Cir., 1961, 287 F.2d 389 (female; narcotic in brassiere)."

75. "Blackford v. United States, supra, n. 1[74]; Denton v. United States, supra, n. 1[74]; Blefare v. United States, supra,

n. 1[74]; Rivas v. United States, supra, n. 1[74]; Application of Woods, supra, n. 1[74]."

76. "See cases cited in n. 1[74], supra."

77. "Blackford v. United States, supra, n. 1[74], 247 F.2d at 751; Denton v. United States, supra, n. 1[74], 310 F.2d at 132."

78. "Rivas v. United States, supra, n. 1 [74], 368 F.2d at 710."

79. "See Blefare v. United States, supra, n. 1[74], 362 F.2d at 875; cf. Witt v. United States, supra, n. 1[74], 287 F.2d at 391."

elsewhere; that there is no disclosure in the record how many men and women crossing the border in that period were subjected to similar searches as a result of which nothing was found; and that these men and women were "certainly entitled to their dignity and privacy and their interests, too, are to be weighed." *Henderson*, supra, 390 F.2d at 808.

Here in *Huguez* as in *Henderson*, appellant crossed the border with another person in an automobile. The customs officers had not received any advance information with respect to the car, to the other person or to Huguez that would alert the officers to the possibility that they might possess or be carrying narcotics. Contrariwise, there was such information, and from reliable informants, in *Denton*, *Blefare* and *Witt*, supra, note 74. Neither Huguez nor his companion was a known, convicted and registered user of narcotics, as the defendants were in *Murgia* and *Rivas*; neither of them did or said anything to arouse suspicion. The agents had not been told by Huguez or anyone else that he had anything concealed in his body, as was the case in *Blackford* and *Murgia*.

It is true, and the record indicates, Teela did become "somewhat suspicious" that the two men were under the influence of narcotics when he observed that their eyes appeared to be glassy and pinpointed.[80] This, under the test of *Schmerber*, *Rivas* and *Henderson*, might be sufficient to justify the initial detention by Inspector Teela, since it probably can be interpreted as a "mere suspicion". It might also, for the same reason, be sufficient to support the examination of the personal clothing and the strip and skin search of the naked Huguez and his companion by Inspectors Teela and Lasher in the secondary area and its windowless search room, during which they discovered what Lasher said was the presence of "needle marks on their arms" as well as what Teela said was a "greasy substance" on appellant's buttocks.[81]

But when the two men were turned over to Agents Gates and Maxcy, Lasher informed Gates only of the "needle marks", and Teela failed completely to say anything at all to either Gates or Maxcy about the "greasy substance" he had allegedly observed on Huguez's buttocks, or about the "glassy and pinpointed eyes", or about the United States citizenship of Huguez and his failure to register or present a certificate as a narcotic user or addict.

Any "mere suspicion" that Inspector Teela had was never in any way communicated to Gates or Maxcy, and when Gates and Maxcy took Huguez and his companion from the windowless search room to the baggage area across the street where the brutal and painful intrusive rectal cavity invasion was conducted, Gates and Maxcy *did not* and *could not* have even the "mere suspicion" that Inspector Teela had, let alone any "clear indication" or "plain suggestion" of any cache of narcotics in Huguez's rectum, as required by *Schmerber*, *Rivas* and *Henderson*.

Therefore Gates and Maxcy *did not* and *could not* have passed on to Dr. Salerno and Agent Spohr any information about the physical condition of Huguez and his companion that could raise the slightest real suspicion in these two other participants in the "force process" of the intensive body cavity search.

Without a search warrant, without any "clear indication" or "plain suggestion" that Huguez carried narcotics in his rectal cavity, and in fact without the slightest real suspicion of any such rectal cavity cache, Dr. Salerno proceeded to conduct the examination on his own initiative without any request or suggestion that he do so, but with the aid of the three customs agents—Gates, Maxcy and Spohr. He followed up with his digital rectal probing without having observed any "greasy substance", and then Huguez was handcuffed, thrown on the table, pressured flat down and pulled

80. RT 78-81.

81. RT 90, 79.

by the handcuffs until the metal bit into his flesh and the skin was peeled, resulting in cuts on his wrists. In these circumstances, the "medical examination" degenerated into a "force process", so aptly termed by Agent Gates, which cannot be condoned, justified or upheld as a constitutional border search. Rather, it is a brutal invasion of privacy, an illegal and frightening example of unlawful law enforcement. The evidence so gained should have been suppressed and excluded in the prosecution of Huguez. That not having been done, our duty and obligation is to apply the *Schmerber-Rivas-Henderson* test. And so doing we must and do reverse appellant's conviction.

### III

### THE "FORCE PROCESS" EXERTED ON APPELLANT EXCEEDS THE CONSTITUTIONAL LIMITATIONS OF THE FIFTH AMENDMENT.

Here again we start with the most apposite case available to the District Court at the *Huguez* trial in May, 1966, in determining the test which should be applied under the Fifth Amendment. Blackford v. United States, 247 F.2d 745 (9th Cir. 1957).

We agree that "the Fourth and Fifth Amendments are companion pillars in the Bill of Rights structure which protects the individual against arbitrary government invasion of personal freedom and liberty." (247 F.2d at 748). And that though their ultimate goal is the same, they combat different evils:

> "The Fourth Amendment safeguards the right to be free from unreasonable searches and seizures; the Fifth Amendment guarantees the individual against being compelled to give evidence against himself and also assures to him under the Due Process proviso, fair and humane treatment by federal law enforcement officers." (247 F.2d at 748)

If Huguez's Fifth Amendment rights were violated, the narcotics were inadmissible at his trial and the judgment of conviction must be reversed. Rochin v. People of State of California, 342 U.S. 165, 172, 72 S.Ct. 205, 96 L.Ed.2d 183 (1952), reversing conviction; Breithaupt v. Abram, 352 U.S. 432, 435, 77 S.Ct. 408, 1 L.Ed.2d 448 (1957), affirming conviction; but compare dissenting opinions of Warren, C. J. at 440, 77 S.Ct. at 412 and Douglas, J. at 442, 77 S.Ct. at 414.

Our Ninth Circuit carefully distinguishes *Blackford* from *Rochin* and identifies it with *Breithaupt*. While Rochin was abused and his rights violated by forcible attacks, Blackford was treated civilly throughout the rectal examination; there was only a suspicion that Rochin had swallowed pills whereas Blackford admitted he had a cache of narcotics in his rectal cavity, an admission corroborated by the presence of a greasy type substance around the anus; whereas the regurgitation in *Rochin* was induced by the application of intense physical pressure and enforced stomach pumping, the physical examinations and rectal extraction in *Blackford* were by "qualified physicians, under sanitary conditions, with the use of medically approved procedures" in the San Diego County Jail and the United States Naval Hospital at San Diego. Blackford, supra, 247 F.2d at 747, 752.

The test of *Rochin-Breithaupt* as followed in *Blackford* was stated to be "whether the alleged activity of law enforcement officers in obtaining the questioned evidence fell short of civilized standards of decency and fair play", or was "so unconscionable that it 'shocks the conscience' or 'offend[s] a sense of justice'". Blackford, supra, at 750.

But again, in considering Fifth Amendment restrictions and just as we did in discussing Fourth Amendment limitations, we cannot stop with *Blackford,* even though it was the compelling authority for the District Court here in *Huguez* at the time of trial. We must turn to and are necessarily bound by the later and more authoritative decisions for guidance in determining the impact of the Fifth Amendment upon intrusive

body cavity invasions conducted during border searches.

In doing so we emphasize it is not essential to our decision that we find a violation of the Fifth Amendment. We have already found a violation of the Fourth Amendment since the initiation of the intrusive body cavity search was unjustified because of the lack of any "clear indication" or "plain suggestion" in the minds of Dr. Salerno and his rectal invasion squad members, that Huguez had any narcotics cached in his rectal cavity.

In Blefare v. United States, 362 F.2d 870 (9th Cir. 1966), the methods used and the conduct pursued therein are distinguished from the methods used and the conduct pursued in *Rochin*. The examination of Blefare and his codefendant took place in the doctor's office in San Diego some 12 miles from the border; defendant Blefare willingly acquiesced in a rectal examination and in drinking an emetic, consented to be searched by a physician and protested only at the swallowing of a tube through which a saline solution was introduced into his stomach; defendant Michel did not object to the anal examination, the saline water swallowing or the saline solution introduced by tube; and a doctor performed carefully, expertly and with medical propriety, precisely what each of the defendants proposed to do for and to himself. Blefare at 872, 874, 877–878. Further, it was clear that the officers had reliable information from the Royal Canadian Mounted Police that Blefare had admitted prior smuggling from Mexico to Canada of an ounce of heroin in his stomach. The doctors, therefore, started their examinations with reasonable certainty that the narcotics were in appellants' stomachs at the time of the examinations. On this basis, the judgments of conviction in *Blefare* were affirmed despite the vigorous dissent that the facts in *Blefare* were much closer to *Rochin* than to *Breithaupt*.

Then we have the Supreme Court's ruling in a nonborder case, Schmerber v. State of California, 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966), that the Fifth Amendment applies to bodily intrusions yet does not require reversal of a judgment of conviction based on the introduction into evidence of a chemical analysis for alcohol content of a blood sample extracted from the body of the defendant over his protest, by a physician in the hospital where the defendant had been taken for treatment of injuries received in an auto accident. The Court enlarged on the *Rochin-Breithaupt* test of "reasonableness" in the following language:

"Petitioner's blood was taken by a physician in a hospital environment according to accepted medical practices. We are thus not presented with the serious questions which would arise if a search involving use of a medical technique, even of the most rudimentary sort, were made by other than medical personnel or in other than a medical environment—for example, if it were administered by the police in the privacy of the stationhouse. To tolerate searches under these conditions might be to invite an unjustified element of personal risk of infection and pain.

\* \* \* \* \* \*

"It bears repeating, however, that we reach this judgment only on the facts of the present record. The integrity of an individual's person is a cherished value of our society. That we today hold that the Constitution does not forbid the States minor intrusions into an individual's body under stringently limited conditions in no way indicates that it permits more substantial intrusions, or intrusions under other conditions." (Schmerber, 384 U.S. at 771–772, 86 S.Ct. at 1836)

Once again in the Ninth Circuit, *Rivas*[62] reiterates the Fifth Amendment limitations on body cavity border search-

---

62. Rivas v. United States, 368 F.2d 703 (9th Cir. 1966), cert. den. 386 U.S. 945, 87 S.Ct. 980, 17 L.Ed.2d 875 (1937).

es by distinctions from *Rochin*, comparisons with *Breithaupt* and references to *Schmerber*:

"This is *not a Rochin* case, with its physical assault on a defendant, both before the stomach pumping, and at the time of its occurrence. It was the *physical assault* in *Rochin* which caused reversal and which 'led to a result in *Rochin* contrary to that in Wolf [Wolf v. [People of State of] Colorado, 338 U.S. 25 [69 S.Ct. 1359, 93 L.Ed. 1782] (1949)]. Although *Rochin* raised the search-and-seizure question, this Court studiously avoided it and never once mentioned the *Wolf* case. Obviously it thought the illegal search and seizure alone did not call for reversal.' Irvine v. People of State of California, 347 U.S. 128, 133, 74 S.Ct. 381, 382, 98 L.Ed. 561 (1954). See also, Blefare v. United States, 362 F.2d 870, 876–877, n. 1 (9th Cir. 1966). 1966).

"Here the evidence shows a technical physical assault (in that hands were laid upon appellant), but no degrading or shameful physical assault upon him, in the sense the Supreme Court found in *Rochin*, supra. It was a technical assault similar to that upheld as proper in *Blackford*, supra. Again, technically, the physical assault, the 'gentle' probing of the rectum, was not as pronounced an assault, medically, as the puncture of the skin in Breithaupt v. Abram, 352 U.S. 432, 77 S.Ct. 408, 1 L.Ed.2d 448 (1957). In *Breithaupt*, the blood was taken while the appellant was unconscious. But 'the taking of blood by a skilled technician' is not 'conduct that shocks the conscience,' nor such a method of obtaining evidence as offends a 'sense of justice,' said the Supreme Court, citing and distinguishing *Rochin*, supra, and Brown v. State of Mississippi, 297 U.S. 278, 56 S.Ct. 461, 80 L.Ed. 682 (1936). Cf. Schmerber v. State of California, 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966).[5][83]

"The use of the evidence in this case, like *Rochin, Schmerber, Blackford,* et al. (in fact, in any case where a body cavity is gently, in a medically approved manner, searched), does not (a) involve evidence of a testimonial nature; (b) require a defendant to testify against himself; (c) constitute a denial of due process. (See discussion of these points in Schmerber, supra, 384 U.S. pp. 768–771, 86 S.Ct. 1826.)" (368 F.2d at 710–711)

Applying what we may call the *Rochin-Breithaupt-Schmerber-Rivas* test of reasonableness of place, methods and conduct to the intrusive body cavity invasion here in *Huguez*, we cannot help but find that appellant has been deprived of his due process rights under the Fifth Amendment. Instead of fair, humane and civil treatment by federal law enforcement officers, and a medical examination in a hospital under sanitary conditions by a qualified physician with the use of scientifically and medically approved procedures, as in *Blackford*, Huguez was subjected to a brutal, painful and degrading "force process" in the non-antiseptic, non-hygienic surroundings of a bare baggage room, furnished with an "examination table" upon which he was thrown, pressured prone, and forcefully pulled by handcuffs that bit into his flesh, peeled his skin and cut his wrists.

Instead of willingly acquiescing in a rectal examination and in drinking an emetic; instead of consenting to be searched by a physician; instead of protesting only at the swallowing of a tube at the doctor's own office some 12 miles from the border; instead of a procedure performed by a doctor carefully, expertly and with medical propriety as well as precisely in a manner that the defendant proposed to do for and to himself, all as in *Blefare;* contrariwise here in *Hu-*

83. "In this connection we point out the following in appellant's brief:
" 'Search of Rivas' rectum was made by a physician in his office according to accepted medical practice. Therefore appellant has not challenged the manner and means used to carry out the search.' "

*guez* the defendant violently resisted the rectal examination, refused to consent to the physician's probe, and vociferously protested at all stages prior to and throughout the "force process" carried on in a baggage room at the border 12 miles from the doctor's office, in a procedure conducted violently, unhygienically, without medical propriety and with laughter and jokes.

Incidentally, the same physician was involved in both *Blefare* and *Huguez*—Dr. Paul R. Salerno—but operating in methods and surroundings strikingly dissimilar.

Instead of the use of a medical technique by a physician in a hospital environment according to accepted medical practices as in *Schmerber,* here we are presented with serious questions of unconstitutionality arising from the use of a rudimentary medical technique in "other than a medical environment", in the non-antiseptic and non-hygienic atmosphere of a baggage room with the unjustified element of personal risk of infection and pain. Surely this is no "minor intrusion[s] into an individual's body under stringently limited conditions" approved in Schmerber, 384 U.S. at 772, 86 S.Ct. at 1836, but rather a grievous, dangerous, unjustified and unjustifiable assault upon the integrity, privacy and dignity of a human being who, for all his faults, as a person and a citizen of the United States, was entitled to but did not receive the constitutional protection of the Fifth Amendment.[84]

The evidence against him so obtained should not have been admitted at the trial and for this reason, in addition to the violation of the Fourth Amendment, Huguez's conviction cannot stand. The judgment is reversed and the cause is remanded to the District Court for further proceedings.[85]

---

84. We have considered but do not discuss the question of whether the doctor and the law enforcement officers here in *Huguez* should have, because of the absence of any emergency or compelling urgency, procured and served a search warrant before attempting to initiate the rectal cavity examination.

Extreme internal body searches, especially forcible, intrusive rectal cavity invasions, such as occurred in *Huguez*, if necessary or desired by law enforcement, and particularly by customs officials at border crossings, perhaps should be authorized only upon the issuance of search warrants under appropriate judicial scrutiny, unless a true emergency or compelling urgency is apparent. Why any less protection should be given to the human body than to the human home is difficult to explain, even in the context of a border search. Nor are the intimate internal areas of the physical habitation of mind and soul any less deserving of precious preservation from unwarranted and forcible intrusions than are the intimate internal areas of the physical habitation of wife and family. Is not the sanctity of the body even more important, and, therefore, more to be honored in its protection than the sanctity of the home, despite the obvious and proper distinction between *inland* dwelling searches and *border* rectal searches?

85. No effort will be made herein to respond to the dissenting opinion's caustic characterizations of the language of the majority. But the dissenting opinion does contain one statement which should not be left unchallenged. Referring to the possibility of the presence of narcotics in Huguez's rectal cavity, the dissenter writes:

"The trial court concluded that there was evidence in the record sufficient to constitute such a 'clear indication'." (dissenting opinion, p. 389, infra)

As a matter of fact, the trial court did not make any such finding, and there was no reason why it should have done so. *Schmerber* had not then been decided, and this Court had not yet adopted the "clear indication" test announced in *Rivas* under *Schmerber's* compulsion.

*Rivas* was not decided until November 8, 1966, more than five months after Huguez was tried on May 26, 1966. The three other leading cases laying down guidelines in this field of intimate body cavity searches were also decided *after* the trial of Huguez—*Blefare* on June 8, 1966; *Schmerber* on June 20, 1966; and *Henderson* on July 7, 1967.

What the trial court *did* say was based on Judge Barnes's opinion in *Blackford*, decided nine years earlier in 1957, and

ELY, Circuit Judge (concurring):

I agree with the disposition reached by Judge Hauk in his principal opinion, although his route to the end result is perhaps more winding than that which I would have selected. My concurrence stems from conviction, shared by Judge Hauk and based upon all the circumstances, that (1) the overbearing manner of the forceable bodily invasion, in the environment in which it was made, was shockingly offensive under the teaching of Rochin v. California, 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952), and (2) in support of the type of search, there was not that "clear indication" or "plain suggestion" required by recent controlling precedents, principally, the Supreme Court's case of Schmerber v. California, 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966), and our own cases of Rivas v. United States, 368 F.2d 703 (9th Cir. 1966), cert. denied, 386 U.S. 945, 87 S.Ct. 980, 17 L.Ed.2d 875 (1967), and Henderson v. United States, 390 F.2d 805 (9th Cir. 1967).

I am moved to record my view that the "clear indication" test, somewhat nebulous in concept, does not satisfy me, even though, to be sure, I do, as I must, now respect it. Judge Hauk and I have here concluded, upon the basis of a study which has been essentially factual, that "clear indication" that contraband was concealed in the rectum did not exist.[1] My Brother Barnes, whose wisdom cannot be justly questioned, disagrees. The creators of multiple-judge appellate courts contemplated that each of the judges should conscientiously apply his own independent judgment in the resolution of disputes. Here the majority reaches a conclusion favorable to Huguez, but it is altogether possible that had another judge sat in the place of Judge Hauk or of me, the opinion of Judge Barnes would have prevailed.

None should deny that there should be uniformity in the application of legal principles. Huguez should not have the benefit of a decision which might possibly be denied to others in the same position. Moreover, the border police, already confronted with perplexing problems incident to their zealous efforts to protect the public, should be equipped with the clearest possible guidelines.

---

was clearly a finding of "suspicion" and not "clear indication":

"* * * I am sure that where there is a well-founded suspicion that he is using narcotics, it follows almost as night follows day that he is carrying narcotics somewhere, because the supply is easy to get in Tijuana, it is cheap, and they are going to bring it across." (R.T. 132–133)

1. Accepting the fact that Huguez presented the appearance of having used narcotics, I cannot believe that this appearance, of itself, constituted the required "clear indication" that he was then and there concealing narcotics in a particular cavity of his body. A human derelict is no less entitled to the law's protection than the more respected individual, and the former is much more in need of it.

One of the officers testified that he observed a "greasy substance" on appellant's buttocks, but the doctor who conducted the rectal probe testified that no such substance was present. It can hardly be doubted that the physician's examination required the more advantageous view. A layman might easily, from visual observation alone, mistake perspiration for grease, whereas a physician conducting the closer examination would be far less likely to make such a mistake. The interrogation on this point called for expert opinion; hence, the only competent evidence, that of Dr. Salerno, favors Huguez.

The majority in *Blefare* was keenly impressed with the opinions there expressed by Dr. Salerno. In his concurring opinion, my Brother Barnes deemed it worthwhile to set forth, in detail, the doctor's qualifications. 362 F.2d at 879 n.3. Even did he not have an extensive educational background, Dr. Salerno must surely have looked at the many, many rectums which he has probed for the border police. While the lighting of the room in the baggage area may not have provided the visual aid ordinarily available in decent medical surroundings, the handicap was not such as to prevent the doctor's unequivocal testimony, given quite positively, that the greasy substance, claimed to have been seen by the officer, was not there.

The foregoing considerations, which must be disturbing to all those charged with the responsibility of insuring equal, exact, and universal justice, lead me to reiterate the fixed belief which I so recently expressed in my dissenting opinion in Blefare v. United States, 362 F.2d 870, 880 (9th Cir. 1966). It is:

"When time permits and when the contemplated search procedure is extreme, if not shockingly offensive, the search, if made without authority therefor having been sought of a magistrate, is unreasonable within the meaning of the Fourth Amendment."

362 F.2d at 887.

I do not maintain that the adoption of my proposed rule would always provide an ideal solution to the type of disturbing problem which is presented here and which we encounter with increasing frequency. Nor do I pretend to have devised it originally, without reliable markers set by jurists whose intellects command the utmost respect. See, e. g., Mr. Justice Frankfurter's dissenting opinion in United States v. Rabinowitz, 339 U.S. 56, 68, 70 S.Ct. 430, 94 L.Ed. 653 (1950). See also Mr. Justice Brennan's comments in *Schmerber.* 384 U.S. at 770, 86 S.Ct. 1826.

Although my proposal was rejected by the majority in *Blefare,* it has been favorably received by some who labor in the field of legal scholarship. See Comment, Intrusive Border Searches—Is Judicial Control Desirable?, 115 U.Pa.L. Rev. 276 (1966) ; Note, "Search and Seizure at the Border—The Border Search," 21 Rutgers L.Rev. 513 (1967) ; 19 Fla. L.Rev. 374 (1966) ; 18 W.Res.L.Rev. 1007 (1967). See also Note, "Border Searches and the Fourth Amendment," 77 Yale L.J. 1007 (1968).

BARNES, Circuit Judge (dissenting) :

I respectfully but firmly dissent. The majority opinion, it might be said, "goes through the motions" of respecting the trial court's conclusion that the evidence discloses a reasonable search (p. 13), and even purports to examine the evidence "in the light most favorable to the Government, as we are obliged to do" (p. 13) and then immediately proceeds to do neither. It does this by quoting at length the self-serving language of the defendant, and finding any contradictory testimony "palpably unworthy of belief." (p. 13).

It is actually impossible for me to recognize the facts, the conduct, and even certain physical objects described in the majority opinion when I compare its language with the transcript of testimony heard by the trial court. Florid, argumentative, and dramatic language is used to color judgment and to emphasize certain facts, and to de-emphasize others.[1]

---

1. As examples: (a) the original examination room is always described as "windowless." I see no reason why that adds anything to the opinion. Being windowless, there would be no opportunity for a suspect to dispose of smuggled narcotics, or other incriminating evidence during or prior to examination. This, I would say, serves a valuable purpose.

(b) The border station room in which the defendant was medically examined repeatedly becomes, for apparent purposes of persuasion, "only a bare baggage room with 'an examination table' in it." (p. 6) The majority, in footnote 28, tell us that although the doctor described this room as an "examination room," (R.T. 31), and an agent called it "a ·doctor's office" (R.T. 49), "it was still nothing more than a *bare room in the baggage* area with an 'examination table as *the*

*only medical equipment,*'" citing R.T. 49. But R.T. 49 does not support such a statement of "fact":

"Q. And insofar as medical equipment consists of, you had the examination table; is that my understanding?

"A. Yes, sir.

"Q. And that is the extent of your medical facility down there; is that my understanding?

"A. Well, *there were other medical facilities there.* For the purpose of rectal examination, this is all that is needed. The individual bends over, flexes the body at the trunk at a ninety-degree angle and rests the upper torso or body on the examination table, supports his lower, lower body with his feet." (emphasis added.)

Being "in the baggage area" does not make the room a baggage room.

I therefore prefer to draw my own statement of facts which I sincerely believe is more accurate, and decidedly more fair, than that appearing in the majority opinion.

Appellant Huguez (with a codefendant alleged to have aided and abetted him) was charged in two counts of a four-count indictment with knowingly smuggling four ounces of heroin into this country from Mexico, and with transporting and concealing the same heroin in this country. 21 U.S.C. § 174 (1964). After a trial in the District Court for the Southern District of California, appellant was convicted on both counts. The third and fourth counts, which charged the codefendant and the appellant with failing to register as narcotics addicts or users upon entry into the United States, were dismissed as to appellant by the trial court. The sentences imposed upon appellant relating to the two counts upon which he was convicted were ordered to be served concurrently.

Jurisdiction below rested on 18 U.S.C. §§ 1407, 3231 (1964), and 21 U.S.C. § 174 (1964). Our jurisdiction over this appeal is established by 28 U.S.C. §§ 1291, 1294 (1964).

The only error urged by appellant concerns the failure of the trial court to grant his motion to suppress the heroin, which was introduced as evidence by the Government. Fed.R.Crim.P. 41(e). Suppression was allegedly called for because:

(a) the heroin was seized without a search warrant;

(b) there was no probable cause to believe that the search by means of which

(c) Again, according to the majority, Dr. Salerno "took it upon himself to conduct the forcible and intensive rectal cavity search." This statement simply flies in the face of reality. Why was the defendant Huguez taken to the doctor's office if not because of a prior decision that he should be rectally examined?

(d) Again, the rectal search is always referred to as "brutal" and generally as "painful." The defendant is "thrown on the table," the handcuffs "bit in his flesh" and "his skin was peeled." The physician and the United States Government employees "laughed at the defendant," and examined him "amid laughter and jokes"! The use of such language depends on the rejection of all prosecution testimony— a matter peculiarly within the discretion of the trial court, who heard the testimony given and could judge the credibility of the various witnesses. The majority, to improve their factual position, accept only the non-government version.

(e) Even when the record discloses a simple answer "no," (when the doctor was asked if he had used "Nalline or urine tests," R.T. 7), this becomes, in the opinion, not Nalline or urine tests, but "ordinary and easily given 'Nalline or urine tests' "—a medical characterization nowhere appearing in the record. Thus, going beyond the record, the majority purports to be experts on medical questions.

(f) Nowhere does the majority opinion touch upon the two inch scar tract on the left forearm, indicating appellant was an addict; or at the very least, that he had been a frequent user of narcotics. This damning information is simply disregarded; and reference made only to the "small needle-puncture marks" at the base of the right thumb and wrist.

(g) Finally, not content with resting on the defendant's conflicting testimony *alone*, the majority *assumes* certain facts exist. The opinion relies on this pure assumption of fact with not the slightest basis for it in the record—namely that the rectal insertion of the heroin was "made immediately prior to the border crossing." (note 62)

The concurring opinion of my Brother Ely states that the majority opinion rests upon "the basis of a study which has been essentially factual." I am not sure I understand what *"essentially factual"* means in this context, but if I do understand it, it means "almost factual." I can not agree it comes that close. Judge Ely's note points out that there is evidence to support the "existence of a greasy substance" on appellant's buttocks when he was first examined, but then dismisses this factual evidence by saying that *only* "expert opinion" will suffice to prove the existence of such substance. No case law or statute is cited in support of this strange theory, and I know of none that can be. Further, the possibility of a suspect in custody removing the telltale indicium of the rectum's use as a repository during the time between the original lay examination and the subsequent medical examination is not even mentioned, nor explained.

the heroin was discovered would yield any contraband; and

(c) the heroin was procured through the unconscionable use of force.

## I. FACTS

In view of the judgment below, the record must of course be considered in the light most favorable to the Government. With this point in mind, I feel that the following facts are established:

Appellant entered the United States by automobile from Mexico on March 13, 1966, with one companion. The entry was made at San Ysidro, San Diego County, California. The two men declared no narcotics to the United States Customs Inspector Thomas N. Teela, who met them at the primary inspection point.

Inspector Teela, who had been a customs inspector at San Ysidro for eight years and had had experience observing narcotics violators during that period, observed that appellant's eyes, as well as those of his companion, seemed to be pinpointed and glassy. Appellant "appeared to be under the influence of narcotics." R.T. 77–78, 81.

Appellant was searched in a secondary area search room. To Inspector Teela, who with the assistance of an Inspector Lasher conducted the search, a greasy substance was "plainly apparent" on appellant's buttocks, near the anus. R.T.

79, 82–83. Appellant was then taken across the street to an examination room, where Dr. Paul R. Salerno examined him. R.T. 28, 31, 39. Dr. Salerno was licensed to practice medicine in the state of California and had had considerable experience in examining and identifying drug addicts.[1a]

An examination of appellant's arms disclosed to the doctor (a) small needle-puncture marks on the right arm, at the base of the thumb, and over the superficial vein of the lateral wrist; and (b) a two-inch scarred "tract" of superficial vein over the left lower forearm. Three of the marks were recent, and there was a hematoma formation. R.T. 31. A careful examination of appellant's eyes showed an incomplete and sluggish reaction of the pupils to darkness. The pupillary diameter was three millimeters in the darkness. The deep tendon reflexes of appellant's lower extremity (sic) were hyperactive, and his pulse was accelerated (130 per minte). R.T. 32.

On the basis of his examination, Dr. Salerno reached the opinion that appellant was a user of narcotic drugs who was then under the influence of such a drug. R.T. 31–32. After this opinion was reached, but without obtaining a search warrant, the doctor conducted a rectal examination to determine whether any material was concealed in the rectal

---

[1a]. Dr. Salerno testified concerning his academic training and subsequent experience in the examination of suspected narcotics violators as follows:

"I received the Doctor of Medicine, or M.D. degree from Western Reserve University in Cleveland in 1955. I also have had training in pharmacology and earned a Ph.D. or doctorate in pharmacology from the University of Chicago in 1949.

"* * *.

"I have been engaged in both the research and the teaching of pharmacology or the mechanism of action of drugs and the biochemical aspects of drug action in the body.

"In addition to the, to the (sic) routine activities as associated with the practice of medicine in San Diego, I have for the past three and a half years been called upon from time to time to ex-

amine individuals for the customs office; examination has been requested to ascertain whether needle marks were present on individuals; also request for examination as to the nature of the needle marks; whether the individual was under the influence of a narcotic drug or some other drug at the time of the examination; request has also been made to establish an opinion with respect to whether the individual appears to be a user of narcotic drugs.

"Q. Over what period of time, Doctor, have you been making these examinations of persons to determine whether they are using or addicted to narcotic drugs?

"A. For approximately three and one half years. The number of individuals examined is, has been approximately 700 to 800 such individuals." R.T. 28–30.

cavity. Using a lubricated glove finger, he located four packets of heroin, which were then similarly extricated. The probe was similar to the rectal examination that is part of any complete physical examination for an adult male, and was made—as was the removal of the packets—in a medically approved manner. Appellant began to resist only when the material was palpated, after which time it was necessary for agents forcibly to restrain him while the packets were removed. No blows were struck and there was no bleeding.

Dr. Salerno testified that in the absence of voluntary resistance by contraction of the external sphincter of the anus, the sensation accompanying removal of the packets "would not be expected to be any more uncomfortable than that experienced with a constipated or hard bowel movement." R.T. 39. In his opinion, the introduction of such packets into the rectal cavity would involve greater discomfort than their removal, provided that resistance was not offered in either case.

The doctor further testified that there would be a mechanical or chemical attack upon the rubber containers in the rectum over a period of time; that the release of the heroin into the rectum could result in death; that leaving the packets in the rectum for more than six to eight hours "would certainly be hazardous," (R.T. 43); that a man in a prison cell might possibly hold similar (though somewhat smaller) objects in his rectum for several days; that it would take approximately eight to ten hours for an oral laxative to achieve effective results; that there are sometimes health hazards involved in the use of laxatives; that an X-ray machine or a fluoroscope would not distinguish between the packaged material and normal fecal contents; that at any rate X-ray machines and fluoroscopes should be operated only by radiologists; and that no radiologist was available.

After the packets were removed, appellant admitted that he had been sent from Los Angeles to pick up the heroin and that he had secreted it in his rectum; insertion of the packets was, he later testified, accomplished by the use of soap and water, which acted as lubricants. Appellant suffered a slight abrasion on one wrist, caused by handcuffs employed during the rectal search; when he made this fact known, the handcuffs were loosened. R.T. 90, 103–04. He did not complain of any other injuries.

Between July 1, 1965, and May 26, 1966, customs officials at San Ysidro reported twenty instances in which narcotics had been recovered from body cavities. R.T. 100–01, 122.

## II. THE UNIQUE NATURE OF A BORDER SEARCH

In considering the propriety of the search thus made of appellant, I first note that it was a border search, made within a few feet of an international boundary of the United States. Such searches constitute, in terms of the application of the fourth amendment to the Constitution, a unique category. They do not require a showing of probable cause. Blefare v. United States, 362 F.2d 870, 874 (9th Cir. 1966); King v. United States, 348 F.2d 814, 817 (9th Cir.) cert. denied, 382 U.S. 926, 86 S.Ct. 314, 15 L.Ed.2d 339 (1965); Witt v. United States, 287 F.2d 389, 391 (9th Cir.), cert. denied, 366 U.S. 950, 81 S.Ct. 1904, 6 L.Ed.2d 1242 (1961);[2] Murgia

2. The *Witt* decision states that:
"there is reason and probable cause to search every person entering the United States from a foreign country, by reason of such entry alone." 287 F.2d at 391.
Although the question may be to some extent one merely of semantics, I feel that this formulation of the principle is somewhat less accurate as a matter of logic than one which recognizes that "probable cause" (to believe that a suspect possesses contraband) is not required in order for a border search to be "reasonable." The mere crossing of a border clearly does not constitute "facts and circumstances * * * sufficient in themselves to warrant a man of reasonable caution in the belief that" the individual in question possesses contraband. Carroll v. United States, 267 U.S. 132, 162, 45 S.Ct. 280, 288, 69 L.Ed. 543

v. United States, 285 F.2d 14, 17 (9th Cir.), cert. denied, 366 U.S. 977, 81 S.Ct. 1946, 6 L.Ed.2d 1265 (1961); Decca v. United States, 346 F.2d 158 (5th Cir. 1965) (per curiam); Mansfield v. United States, 308 F.2d 221 (5th Cir. 1962).[3] "The mere crossing of the border is sufficient cause for such a search." Henderson v. United States, 390 F.2d 805 (9th Cir. 1967). Such border checks are also excepted—along with those incident to a lawful arrest or justified by the "exigent circumstances" or "emergency" principle, see Schmerber v. California, 384 U.S. 757, 770–771, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966)—from the general requirement that searches be made pursuant to judicially issued warrants; nor is consent or a "reliable informant" or a supporting arrest required in order for such a search to be sanctioned. Alexander v. United States, 362 F.2d 379, 382 (9th Cir.), cert. denied, 385 U.S. 977, 87 S.Ct. 519, 17 L.Ed.2d 439 (1966), and cases cited therein; Thomas v. United States, 372 F.2d 252, 254 (5th Cir. 1967); Valadez v. United States, 358 F.2d 721, 722 (5th Cir. 1966).

This extremely flexible application of the fourth amendment finds both illustration and support in federal border control legislation, which grants to border officials authority of the "broadest possible scope." United States v. Rodriguez, 195 F.Supp. 513, 515 (S.D.Tex. 1960), aff'd, 292 F.2d 709 (5th Cir. 1961); cf. King v. United States, 348 F.2d 814 (9th Cir.), cert. denied, 382 U.S. 926, 86 S.Ct. 314, 15 L.Ed.2d 339 (1965); Denton v. United States, 310 F.2d 129, 132 (9th Cir. 1962); Witt v. United States, 287 F.2d 389, 391 (9th Cir.) cert. denied, 366 U.S. 950, 81 S.Ct. 1904, 6 L.Ed.2d 1242 (1961); Morales v. United States, 378 F.2d 187 (5th Cir. 1967); Thomas v. United States, 372 F.2d 252 (5th Cir. 1967); Marsh v.

United States, 344 F.2d 317, 324 (5th Cir. 1965); Kelly v. United States, 197 F.2d 162 (5th Cir. 1952); Landau v. United States Attorney, 82 F.2d 285, 286 (2d Cir.), cert. denied, 298 U.S. 665, 56 S.Ct. 747, 80 L.Ed. 1389 (1936); United States v. Yee Ngee How, 105 F.Supp. 517, 519–520 (N.D.Cal.1952). Customs officials are authorized by 19 U.S.C. § 482 (1964) to: "stop, search, and examine * * * any vehicle, beast, or person, *on which or whom* * * * *they shall suspect* there is merchandise which is subject to duty * * *." (Emphasis added.) And 19 U.S.C. § 1581(a) (1964) authorizes such officials to "examine, inspect and search * * * any person" on board a vessel or in any vehicle within a customs-enforcement area. See also 19 U.S.C. § 1582 (1964), and, as to immigration officials, 8 U.S.C. § 1357(c) (1964). The extraordinary extent of these powers has been justified by reference to traditional principles of sovereignty and to the paramount interest of any country in "national self preservation." Carroll v. United States, 267 U.S. 132, 154, 45 S.Ct. 280, 69 L.Ed. 543 (1925); Fernandez v. United States, 321 F.2d 283, 285 (9th Cir. 1963), and embodies congressional authorization of long standing. As the Supreme Court has recognized, the same Congress which "proposed for adoption the original amendments to the constitution" enacted the first statute giving broad authority to customs agents to search for and seize contraband, thus indicating that "the members of that body did not regard searches and seizures of this kind as 'unreasonable' * * *." Boyd v. United States, 116 U.S. 616, 623, 6 S.Ct. 524, 29 L.Ed. 746 (1886).

What has been said does not mean, however, that every border search, no matter what its justification, scope, or methods, is totally exempt from the re-

---

(1925). But the practical difficulties connected with operating an effective customs check do create a "reason" for and justify searches of entrants on the basis of "mere suspicion," or even at random. Thus, the "reason" exists without "probable cause."

3. "The right of a border search does not depend on probable cause and is in a separate category from searches generally. Detention and searches are the essence of the enforcement of laws governing the detection and punishment of smuggling." 308 F.2d at 222–223.

quirements of the fourth amendment. Henderson v. United States, 390 F.2d 805 (9th Cir. 1967); Rivas v. United States, 368 F.2d 703, 710–712 (9th Cir. 1966), cert. denied, 386 U.S. 945, 87 S.Ct. 980, 17 L.Ed.2d 875 (1967); Thomas v. United States, 372 F.2d 252, 254 (5th Cir. 1967); Marsh v. United States, 344 F.2d 317, 324 (5th Cir. 1965). Practical considerations, of course, properly play a large part in any determination whether, in particular circumstances, a search meets that amendment's requirements. See Brinegar v. United States, 338 U.S. 160, 176, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949); Hernandez v. United States, 353 F.2d 624, 628 (9th Cir.), cert. denied, 384 U.S. 1008, 86 S.Ct. 1972, 16 L.Ed.2d 1021 (1966).

III. THE REASONABLENESS OF THE SEARCH IN LIGHT OF THE INFORMATION KNOWN BY THE OFFICERS

In making his argument that the search to which he was subjected was unreasonable, appellant of course emphasizes the fact that the heroin was taken from a body cavity. This factor, he contends, renders inapplicable the rules governing "routine" border searches.

In Schmerber v. California, 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966) the Supreme Court outlined its position with regard to searches below the surface of the body in a situation analogous to that involved here. In *Schmerber* there had been a lawful arrest, a circumstance which ordinarily makes proper a thorough search of an individual arrested, even though there exists neither a warrant nor probable cause to believe that contraband, weapons, or relevant evidence will be found. In that sense, a search pursuant to a proper arrest is similar to a border search. The extraction of a blood sample that was involved in *Schmerber* was held, however, to be governed by a somewhat more restrictive rule:

"We begin with the assumption that once the privilege against self-incrim-

ination has been found not to bar compelled intrusions into the body * * * the Fourth Amendment's proper function is to constrain, not against all intrusions as such, but intrusions which are not justified in the circumstances, or which are made in an improper manner. * * *

" * * * * * *

" * * * The interests in human dignity and privacy which the Fourth Amendment protects forbid any such (bodily) intrusions on the mere chance that desired evidence might be obtained. In the absence of a *clear indication* that in fact such evidence will be found, these fundamental human interests require law officers to suffer the risk that such evidence may disappear unless there is an immediate search."

384 U.S. at 768–770, 86 S.Ct. at 1834 (emphasis added).

In Rivas v. United States, 368 F.2d 703, 710–712 (9th Cir. 1966), cert. denied, 386 U.S. 945, 87 S.Ct. 980, 17 L.Ed.2d 875 (1967), and Henderson v. United States, 390 F.2d 805 (9th Cir. 1967), while admitting the difficulty of defining such a "clear indication" standard precisely, we interpreted that language to mean that something less than "probable cause," yet more than "mere suspicion," is required to justify a body cavity search; and we held that rule to apply even to searches made at an international border.

The trial court concluded that there was evidence in the record sufficient to constitute such a "clear indication." I agree.

Appellant argues that Inspector Teela's observation of a greasy substance on appellant's buttocks cannot be attributed to the officer who apparently ordered the rectal probe, see R.T. 41, 70, 89–90, and that that information therefore cannot be considered as a part of the evidence with reference to which the "clear indication" standard is to be applied. I may adopt this position arguendo, without passing upon the reasoning urged in sup-

port of it,[4] since I feel that even apart from this observation made by Teela a reasonable man could conclude there existed a clear indication that appellant was hiding narcotics within his body—and, therefore, that the resulting rectal search was a reasonable one.

First: appellant's arms bore the telltale needle marks that characterize the veins of an addict, or a habitual user of narcotics.

Second: there was every indication that appellant and his companion were under the influence of narcotics when they crossed the border. The informed lay opinion of Inspector Teela and other officers to this effect was confirmed by Dr. Salerno's diagnosis, which was based on much substantiating data. In particular, three fresh needle marks were observed, indicating that an injection had recently been made—"within hours."

Third: appellant presented no certificate of registration under 18 U.S.C. § 1407 (1964) as a narcotics user or addict. R.T. 77.[5]

Fourth: as the experienced trial judge indicated, once the conclusion is reached that an American citizen crossing into this country at San Ysidro is a user of narcotic drugs—particularly when he has not registered under 18 U.S.C. § 1407 and when he is then under the influence of narcotics—there is a reasonable basis for the inference that he is "carrying narcotics somewhere, because the supply is easy to get in Tijuana, it is cheap," R.T. 132–33, and the value of such drugs is much greater in this country than in Mexico.

4. I prefer to avoid deciding this question largely because of deficiencies in the record. Were I to consider the issue, the Government might well cite the fact that Teela was "assisted" in his original search of appellant by Inspector Lasher, R.T. 79, who was also present in the examination room at the time of the rectal probe. R.T. 92. And, although Agent Walter A. Gates seems to have ordered the probe, this conclusion is not clear from the record, nor even if Gates did in fact authorize the search, is it clear what information he had before him at the time. Thus, Lasher, who did not testify, may have had knowledge of the substance Teela saw on appellant's buttocks, and may have participated to some extent in the decision to order the rectal probe.

Alternately, the Government might argue that Teela's decision (made jointly with Lasher) to suggest further action after his examination of appellant, R.T. 79, should be viewed as an implied communication of his general conclusions concerning appellant (if not his specific knowledge) to those who in fact took such action. True, Gates testified that no one suggested the physical examination to him. R.T. 90. Teela (and Lasher) clearly did exercise some discretion, however, in "advising the Agency" and holding appellant for further proceedings of some sort. Conceivably such action contemplated as a general matter that a thorough physical examination would be made, so that Teela may have played some part in bringing about the search.

I note these possibilities, of course, without endorsing either their factual or their legal aspects. I seek merely to put into context my decision, considering the state of the record before me, not to pass upon them.

5. It is true that only Inspector Teela testified as to appellant's failure to present such a certificate. I feel that this information may properly be viewed as having been conveyed by implication, however, to Agent Gates. Gates testified that he was told "only" of the needle marks on appellant's arms. R.T. 89. But it is a fair assumption that registration under 18 U.S.C. § 1407 would be reported as a matter of course by customs inspectors, so that individuals not thus specified to be registrants would be presumed by officials making further inquiry not to have registered. It is therefore likely that, not having been told that appellant had so registered, Gates believed —correctly and with justification—that he had not. A similar analysis is justified with respect to Teela's failure, referred to below, to find narcotics hidden in appellant's car. Any such discovery certainly would have been reported; indeed, appellant would in such circumstances probably have been immediately arrested. These questions are in this respect quite different from that of Teela's observation of the greasy substance on appellant's buttocks—knowledge of which it would be difficult to attribute to Gates in the absence of a specific communication of it to him.

Fifth: appellant's car, R.T. 79, as well as his clothes and his person, had been searched, so that the possibility of his carrying narcotics anywhere other than within his body—either in his stomach or in his rectum—was negligible.

Bearing in mind that the "clear indication" standard of *Rivas* and *Henderson* is somewhat less stringent than that of "probable cause," I believe that these factors in combination provide a clear indication that appellant was hiding contraband narcotics in either his stomach or his rectum; and this conclusion justifies the rectal probe conducted by Dr. Salerno, rendering it in that respect "reasonable." The possibility that appellant had swallowed narcotics, intending to regurgitate them later was much less likely than that he had hidden them in his rectum. The testimony of Dr. Salerno, R.T. 38, suggests what is undoubtedly common knowledge among persons who traffic in narcotics—that the rectum is a considerably safer repository for such drugs than the stomach; the acidic nature of the gastric juices in the latter organ makes the swallowing of almost any flexible container of narcotics quite dangerous. Cf. Blefare v. United States, 362 F.2d 870, 873, 873–874 (9th Cir. 1966). It is perhaps for this reason that—insofar as the cases we have had before us over the past decade provide a basis for judgment—by far the majority of those persons who utilize body cavities in attempting to bring narcotics into this country hide the contraband drugs in their rectums (or, in the case of women, in their vaginas). Compare Henderson v. United States, 390 F.2d 805 (9th Cir. 1967) (vagina); Rivas v. United States, 368 F.2d 703 (9th Cir. 1966), cert. denied, 386 U.S. 945, 87 S.Ct. 980, 17 L.Ed.2d 875 (1967) (rectum); Denton v. United States, 310 F.2d 129 (9th Cir. 1962) (rectum); Murgia v. United States, 285 F.2d 14 (9th Cir. 1960), cert. denied, 366 U.S. 977, 81 S.Ct. 1946, 6 L.Ed.2d 1265 (1961) (rectum); and

Blackford v. United States, 247 F.2d 745 (9th Cir. 1957); cert. denied, 356 U.S. 914, 78 S.Ct. 672, 2 L.Ed.2d 586 (1958) (rectum), with Blefare v. United States, 362 F.2d 870 (9th Cir. 1966) (stomach).[6]

It is true that our opinion in *Rivas* makes some mention that it would be "better" if findings of "clear indication" were made by the judiciary rather than by law enforcement authorities. 368 F.2d at 711. However, it is not clear how much weight should properly be given to this language, for its premise would seem to be in conflict with the holding in that case, since endorsed in Henderson v. United States, 390 F.2d 805 (9th Cir. 1967), to the effect that the "clear indication" standard is less stringent than that of probable cause. According to the fourth amendment, a warrant may issue only on a showing which meets the latter standard. In any case, I believe that the threat to appellant's health caused by the danger that the hidden narcotics would be absorbed by his body constituted an "emergency"—similar to those relied on in *Rivas* and *Schmerber*—justifying a warrantless search.

Appellant's first two allegations of error must thus be rejected, and the only remaining question concerns whether there was an unconscionable use of force in the search.

## IV. THE REASONABLENESS OF THE METHODS USED IN THE SEARCH

Even when initiation of a body cavity search is justified, of course, excessive or unreasonable techniques may not be used in carrying out such a search. The evidence cited in part I of this opinion indicates clearly, I believe, that the search was not improper in terms of the methods used. Of prime significance is the fact that, as was the case with respect to the blood sample in *Schmerber*, removal of the heroin was made by a

---

6. It should be clear that I offer no conclusion regarding the reasonableness of a hypothetical "stomach search" (involving, for instance, the use of an emetic) undertaken in circumstances similar to those present here.

doctor using medically accepted methods. Moreover, a rectal probe is a relatively ordinary and uncomplicated procedure. It may well be that appellant experienced some pain during the extraction. However, it seems clear that to a considerable extent such pain was a direct result of his own resistance—a circumstance which certainly lessens the significance of that fact. Although the analogy is not exact, it may be noted that there are many ways in which individuals can cause normal law enforcement procedures to have painful consequences for themselves: it would not, for instance, necessarily be improper for police to refuse to remove handcuffs from a prisoner who, by vigorously twisting his hands and arms, managed intentionally to lacerate his wrists. Furthermore, although it relates primarily to the justification for continuing the probe, the fact that the appellant began to resist physically only after Dr. Salerno had palpated the packets in his rectum is not entirely irrelevant to the reasonableness of the methods used. Finally, the possibility that heroin left in appellant's rectum would seriously threaten his life—certainly bears on the reasonableness of the methods used; and the impact of this possibility is only diminished, not destroyed, by the fact that belief regarding the heroin's presence was based on inference rather than actual knowledge. Cf.

Schmerber v. State of California, 384 U.S. 757, 770–771, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966), with respect to the foreseeable effects of time on the alcohol content of the arrestee's blood in that case.

The abrasion on appellant's wrist is of relatively minor significance. It cannot be inferred that the "redness" testified to by several witnesses was serious, or that it was anything but the incidental result of the chafing of appellant's handcuffs. Indeed, as soon as the attention of the officers was drawn to the matter, the handcuffs were loosened.

In view of these considerations, then, I cannot possibly categorize the officers' course of action here, as did Mr. Justice Frankfurter with respect to the police conduct involved in Rochin v. California, 342 U.S. 165, 172, 72 S.Ct. 205, 210, 96 L.Ed. 183 (1952), as "too close to the rack and the screw" to be permitted. The search to which appellant was subjected is quite different from those extreme measures which might be thought to "shock the conscience." Cf. Blefare v. United States, 362 F.2d 870, (9th Cir. 1966); Blackford v. United States, 247 F.2d 745 (9th Cir. 1957), cert. denied, 356 U.S. 914, 78 S.Ct. 672, 2 L.Ed.2d 586 (1958); D. McIntyre & N. Chabraja, The Intensive Search of a Subject's Body and Clothing, 58 J. Crim.L.C.&P.S. 18, 22–23 (1967).[7]

7. "Several considerations may help explain why the courts are less offended by a rectal probe or enema than by stomach pumping or the administration of an emetic. As to the element of pain that may be involved, the courts weigh this aspect of a cavity search against the overall conduct of the suspect. While characterizing a rectal probe as a 'disgusting sequence', courts have no great difficulty, apparently, attributing the necessity for it to the defendant's choice of an equally disgusting repository in the first place. Conventional morality may thus supply the formally missing premise of distinction. This attitude appears to extend also to the suspect who resists a rectal probe, causing some degree of pain and the possibility of physical injury. The courts are not willing to place a premium on the suspect's violent resistance, especially if he is in all other respects treated civilly. Pain in such circum- stances indeed has been termed 'self-inflicted'. In further support of this position, the courts point out that a rectal probe 'is an uncomplicated and nonhazardous procedure'; with regard to the administration of an enema, courts have indicated that it is 'a very normal and natural thing to do.'

"Emphasis has been placed, moreover, on the fact that the contraband in the body cavity may cause serious injury to the suspect unless promptly removed. Testimony by medical experts as to the likelihood of this eventuality has been used to substantiate the use of force. A final point of emphasis is the court's willingness to analogize a cavity probe to forcing a suspect 'with narcotics in a clenched fist to open his hand' or cutting the stitches of a defendant's clothing to recover the contraband contained therein." (Footnotes omitted.)

See also 58 Colum.L.Rev. 565 (1958).

## V. CONCLUSION

Since the search was not unreasonable either with respect to its justification or in the methods used, the judgment of conviction should be affirmed.

On Petition ORDER For Rehearing

PER CURIAM:

The petition for rehearing is denied. Judge BARNES would grant the petition.

A judge in regular active service having requested that the court be polled on the question of in banc rehearing, the requested poll was taken. A majority of the court's judges in regular active service has determined that a rehearing in banc shall not be conducted, and it is so ordered.

Four of the court's judges in regular active service, Judges CHAMBERS, BARNES, KOELSCH, and JAMES M. CARTER, have directed that it be noted herein that they would have reheard the case in banc.