Annette R. DaVEE, Appellant,

v.

Captain Robert MATHIS, Daniel Mulloy, Sgt. Gary Chapman, Kathy Pierce, Sergeant Ivan Wicke, Calvin Hayden, Kent Willnauer, Michael Marshall, Vince Werkowitch, Charles Barnes, Carolyn Lewis, Janet Baker, Respondents.

No. WD43090.

Missouri Court of Appeals, Western District.

June 11, 1991.

Motion for Rehearing and/or Transfer to Supreme Court Denied July 30, 1991.

Application to Transfer Denied Sept. 10, 1991.

Max Von Erdmannsdorff, Brian J. Klopfenstein, Kansas City, for appellant.

Michael J. Maloney, Sevier, Burnett & Maloney, Liberty, for respondents Mathis, Mulloy, Pierce and Chapman.

Roger W. Penner, Dysart Taylor Penner Lay & Lewandowski, Kansas City, for respondents Barnes, Lewis & Baker.

Lawrence L. Ferree, III, Ferree, Bunn & Byrum, Chartered Overland Park, Kan., for respondents Werkowitch, Wicke, Hayden, Willnauer and Marshall.

Before BERREY, P.J., and FENNER and ULRICH, JJ.

ULRICH, Judge.

Annette DaVee appeals the trial court's order granting summary judgment to all defendants to her cause of action. On April 20, 1985, at Kansas City International Airport, area law enforcement personnel and members of the airport's security staff conducted a search, pursuant to a search

warrant, which included a strip search and visual body cavity search of Ms. DaVee. Ms. DaVee brought a civil action alleging a violation of her constitutional rights and assault. All defendants were granted summary judgment by the trial court. The trial court's decision is affirmed.

Prior to April 1984, Annette DaVee was employed by Macy's Department Store in Kansas City, Missouri. In April 1984, Ms. DaVee accepted a position with Burdine's Department Store in Miami, Florida. Prior to her move to Florida, Ms. DaVee was introduced to Mr. B. by a mutual friend. Ms. DaVee arranged her flight from Kansas City to Florida in April 1984 to coincide with a trip Mr. B. was also making to Florida. At some point prior to April 1985, Ms. DaVee learned that Mr. B.'s flight to Florida in April 1984 concerned his involvement in a forfeiture case begun by the Drug Enforcement Administration to forfeit money seized by law enforcement authorities during or as a result of an illegal sale of marijuana. Between April 1984 and April 1985, Mr. B. flew to Florida to visit Ms. DaVee approximately every six to eight weeks.

During the period of time between April 1984 and April 1985, Ms. DaVee also shared a romantic relationship with Mr. C. This romantic relationship ended shortly after Ms. DaVee moved to Florida in April 1984. During the month of April 1985, Mr. C. made an unannounced visit to Ms. DaVee in Florida. Ms. DaVee had purchased an airline ticket approximately thirty days in advance of the scheduled flight to Kansas City to attend a wedding of a close friend in April 1985. During Mr. C.'s visit, he observed Ms. DaVee's airline ticket to Kansas City. When he inquired, Ms. DaVee told him that her job might prevent her from traveling to Kansas City on the date of the scheduled flight.

On April 19, 1985, Mike Marshall, Communications Dispatcher for the Johnson County, Kansas Sheriff's Department, received an anonymous telephone call shortly after midnight. The anonymous caller provided Dispatcher Marshall with the following information: one-half a kilo of cocaine would arrive at the Kansas City International Airport during the upcoming weekend; Mr. B., of Baldwin, Kansas, was bringing the cocaine into Kansas City; a lady, named Annette DaVee, would be carrying the cocaine; Ms. DaVee was a white female and "thirty something"; Ms. DaVee would be flying from Fort Lauderdale to Kansas City; Ms. DaVee had changed her original flight schedule but would be arriving in Kansas City on either Friday, Saturday, or Sunday; Ms. DaVee's originally scheduled flight was on Delta Airlines and she might arrive on Delta or another airline's flight; Mr. B. was in Kansas City and would transport Ms. DaVee from the airport; and Mr. B. owned a Honda Accord. Ms. DaVee believes Mr. C., her former boyfriend, made this anonymous call to Dispatcher Marshall.

Dispatcher Marshall informed Detective Hayden of the Johnson County, Kansas Sheriff's Department, Narcotics Division, of the anonymous telephone call. Detective Hayden then contacted Delta Airlines and inquired as to the flight schedules from Fort Lauderdale to Kansas City. Detective Hayden learned that Ms. DaVee failed to board her originally scheduled flight to Kansas City. However, Delta advised Detective Hayden that Ms. DaVee had reservations on another flight from Fort Lauderdale to Kansas City, scheduled to arrive on Saturday, April 20, 1985. Detective Hayden further investigated the anonymous caller's information and learned that Annette DaVee might have a Kansas address and was 39 years old. Detective Hayden's investigation also revealed that Mr. B. lived in Baldwin, Kansas, and owned a 1985 Honda. Detective Hayden then contacted the Lawrence, Kansas Sheriff's Office, Narcotics Division, and was told that Mr. B. had been arrested and charged for narcotics violations in the past and was considered, by that office, a large scale cocaine and marijuana dealer in that area. Detective Hayden finally contacted a Special Agent from the Drug Enforcement Administration who advised Detective Hayden that he was familiar with Mr. B. and that Mr. B. was presently free on an appeal bond for a prior narcotics conviction.

Following his investigation, Detective Hayden presented the information regarding the anonymous telephone call to Sergeant Wicke of the Johnson County, Kansas Sheriff's Department. Sergeant Wicke immediately transmitted the information to Detective Mulloy of the Kansas City, Missouri Police Department. On April 19, 1985, Sergeant Wicke informed Detective Mulloy that his office had received an anonymous telephone call stating that one-half a kilo of cocaine would arrive at Kansas City International Airport the following day. Detective Mulloy further investigated the information he received from Sergeant Wicke and was able to confirm that Ms. DaVee originally planned to fly from Fort Lauderdale to Kansas City on Delta Airlines, that Ms. DaVee changed her original travel plans, that Mr. B. planned to meet Ms. DaVee at Kansas City International Airport driving a 1985 Honda, and that Mr. B. was the registered owner of a 1985 silver Honda Accord. Additionally, Detective Mulloy, through his investigation, became aware of Mr. B.'s extensive criminal record.

Detective Mulloy and Detective Cathy Pierce, also of the Kansas City, Missouri Police Department, sought assistance from Bruce Hahn, Assistant Prosecuting Attorney for Platte County, in securing a search warrant based upon the information provided by the anonymous telephone caller. The prosecutor prepared an affidavit which stated that the Johnson County, Kansas Sheriff's Department received information that was provided by an anonymous caller. The affidavit also stated that Detective Mulloy corroborated some of the information provided by the anonymous caller. Additionally, the affidavit revealed Mr. B.'s criminal record. Detectives Mulloy and Pierce presented this affidavit to an Associated Circuit Judge of Platte County, Missouri, and the judge issued a search warrant. Assistant Prosecuting Attorney Hahn instructed Detective Mulloy not to execute the warrant until after Mr. B. arrived in the 1985 Honda Accord, Ms. DaVee arrived on the specific flight, Ms. DaVee acquired her luggage and both Mr. B. and Ms. DaVee entered Mr. B.'s 1985 Honda.

Ms. DaVee's flight, Delta flight # 1295, was scheduled to arrive at Kansas City International Airport on April 20, 1985, at 9:36 a.m. At approximately 8:20 a.m., Detective Mulloy and several other members of the Kansas City, Missouri Police Department gathered at Kansas City International Airport. Johnson County, Kansas Sheriff's Department Deputies Wicke, Hayden and Willnauer were also present at the airport to observe and learn how to execute a search warrant at a airport facility. Janet Hestand, Carolyn Lewis, and Charles Barnes, all members of the airport's security staff, and Special Agent Ron Wright of the Drug Enforcement Administration were also present at the airport on the morning of April 20, 1985.

Ms. DaVee arrived at Kansas City International Airport on board Delta flight # 1295 at 9:36 a.m. on April 20, 1985. Mr. B. arrived at the airport and met Ms. DaVee. Ms. DaVee obtained her suitcase and suit bag from the luggage carousel and proceeded to Mr. B.'s 1985 Honda Accord, parked outside the doors of the Delta terminal. Mr. B. placed Ms. DaVee's luggage in his vehicle and entered the automobile. At that time, eight to ten police officers from the Kansas City, Missouri Police Department converged on Mr. B.'s automobile and asked Mr. B. and Ms. DaVee to step out of the vehicle.

Ms. DaVee and Mr. B. were both handcuffed and escorted by police officers back into the Delta airport terminal. Ms. DaVee and Mr. B. were taken to an airport security office which had been vacant for several months. Inside the office, Detective Pierce initially searched Ms. DaVee's purse. Ms. DaVee's handcuffs were then removed and she was taken into a separate room. Detective Pierce and two female airport security officers, Cathy Lewis and Janet Hestand, were the only other people in the room. Detective Pierce instructed Ms. DaVee to remove her clothing and Ms. DaVee complied except for her undergarments. The room in which this search was conducted was dirty and newspapers were spread for Ms. DaVee to place her clothes on. This search lasted several minutes, during

which Ms. DaVee remained clothed in her undergarments. This initial search produced no evidence of criminal activity, and the officers allowed Ms. DaVee to dress herself. Detective Pierce left the room where the search was conducted and reported the unsuccessful results to Detective Mulloy. While Ms. DaVee was being searched, searches of her luggage, Mr. B., and his automobile similarly produced no evidence of the commission of a crime.

Detectives Mulloy and Pierce decided to continue the search by conducting a body cavity search of Ms. DaVee. When informed of the anticipated second search, Ms. DaVee protested and asked whether the search was necessary. Ms. DaVee requested that a physician perform the body cavity search, but this request was denied. Ms. DaVee then requested that the officers obtain sterile gloves prior to performing the body cavity search. Cathy Lewis, of the airport security staff, contacted an emergency van and, after a twenty to thirty minute wait, the requested gloves were brought to the room where the prior search of Ms. DaVee had occurred and where the second search was to be conducted. Like the first search, Detective Pierce and airport security officers Cathy Lewis and Janet Hestand were the only people present during the second search. Detective Pierce ordered Ms. DaVee to completely disrobe. Ms. DaVee was further instructed to lean against the wall, bend at her waist, and spread her buttocks. Detective Pierce then visually inspected Ms. DaVee's anal and genital areas. Cocaine was not found during the visual body cavity search. Ms. DaVee and Mr. B. were both released at approximately 10:50 a.m. after being detained for over one hour while the search warrant was executed.

Ms. DaVee subsequently filed this lawsuit against members of the Johnson County, Kansas Sheriff's Department, the Kansas City, Missouri Police Department and the Kansas City International Airport security staff alleging assault and, in a 42 U.S.C. § 1983 action, violations of her constitutional rights guaranteed by the Fourth and Fourteenth Amendments of the United States Constitution. All defendants to Ms.

DaVee's cause of action moved for summary judgment. Following a hearing, the trial court granted summary judgment to all defendants. The trial court found that defendants Allenbrand, Werkowitch, Wickete, Hayden, Willnauer and Marshall, all members of the Johnson County, Kansas Sheriff's Department, were entitled to qualified immunity from liability on Ms. DaVee's claims. The trial court determined that defendants Napoli, Karmeier, Barnes, Hestand and Lewis, all members of Kansas City International Airport's security staff, were protected from liability by statute. Defendants Mathis, Mulloy, Chapman, Quirk, Pierce, Luke, and Luthers, members of the Kansas City, Missouri Police Department, were granted summary judgments on the basis that Ms. DaVee's constitutional rights were not violated in the course of the search warrant being applied for, issued, and executed. Ms. DaVee appeals from the summary judgments to all defendants.

On appeal, Ms. DaVee contends that the trial court erred in granting summary judgment because her constitutional rights were violated (I) by Detective Mulloy submitting false statements and omitting material statements in his affidavit to secure the search warrant; (II) by the Kansas sheriff's deputies forwarding the information regarding the anonymous call to Kansas City, Missouri, police officers and by the Kansas City officers applying for the search warrant on the basis of this information; (III) by the manner in which the body cavity search was conducted; and (IV) by the second search, the visual body cavity search, being beyond the scope of the search warrant and by the second search being conducted after the search warrant had been fully executed. Ms. DaVee further contends that (V) summary judgment was inappropriate because genuine issues of material fact exist. Finally, regarding her assault claim, Ms. DaVee contends (VI) summary judgment was inappropriate because the Kansas City, Missouri police officers are not entitled to official immunity and the members of the airport's security staff are not entitled to

immunity pursuant to § 542.291, RSMo Supp.1990.

Summary judgment is appropriate when the evidence before the trial court demonstrates no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Rule 74.04(c); *Schneider v. Forsythe Group, Inc.*, 782 S.W.2d 139, 142 (Mo.App.1989). On appeal, this court will review the record in the light most favorable to the party against whom summary judgment was entered, according that party the benefit of every doubt. *Id.*

## I

■ First considered is Ms. DaVee's contention that the trial court erred in granting summary judgment to members of the Kansas City, Missouri Police Department because Detective Mulloy either knowingly, intentionally, or with reckless disregard for the truth included false statements and omitted material statements of fact from the affidavit presented to the associate circuit judge. Ms. DaVee claims that, because of the inaccuracies in the affidavit, the subsequently issued search warrant was based upon uncorroborated information and lacked probable cause.

Ms. DaVee directs attention to several alleged discrepancies between the affidavit signed by Detective Mulloy and the contents of the anonymous telephone call. The anonymous caller stated that Ms. DaVee was "thirty something." Detective Mulloy's affidavit reflects that the anonymous caller stated Ms. DaVee was "in her thirties." The anonymous caller stated that Ms. DaVee would be arriving at Kansas City International Airport on "either Friday, Saturday, or Sunday." Detective Mulloy's affidavit claims the anonymous caller stated that Ms. DaVee would arrive on either "Saturday or Sunday." The anonymous caller also told Dispatcher Marshall that Ms. DaVee's original flight was on Delta Airlines, but he was not sure if her rescheduled flight was also with Delta. Detective Mulloy's affidavit represents that the anonymous caller knew Ms. DaVee would arrive on Delta Airlines but that the caller was unsure of the time of arrival

since Ms. DaVee's flight had been changed. Finally, the anonymous caller, in response to Dispatcher Marshall's question, stated that Mr. B. owned a Honda Accord automobile. Detective Mulloy's affidavit claims the caller stated that Mr. B. would drive the Honda Accord and transport Ms. DaVee from the airport. Ms. DaVee also complains that Detective Mulloy failed to inform the court, through his affidavit, that he discovered an absence of any prior criminal activity on her part.

The United States Supreme Court, in *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), required that, pursuant to the Fourth Amendment, affidavits given in support of search warrants be " 'truthful' in the sense that the information put forth is believed or appropriately accepted by the affiant as true." *Id.* at 165, 98 S.Ct. at 2681. In *Franks*, the Supreme Court determined that a subsequently issued search warrant violates the Fourth Amendment when the affiant knowingly, intentionally or with reckless disregard for the truth includes a false statement in his affidavit filed to obtain the warrant and the affidavit, with the false statement set aside, lacks sufficient information to establish probable cause. *Id.* at 171–72, 98 S.Ct. at 2684–85; *United States v. Henry*, 763 F.2d 329, 331 (8th Cir.1985). Although this court is not convinced that Ms. DaVee's evidence demonstrates that Detective Mulloy knowingly, intentionally or with reckless disregard for the truth included false statements in his affidavit, this court considers whether, setting aside the allegedly false statements, sufficient information is presented to establish probable cause under the *Franks* analysis.

■ The test for determining whether probable cause exists for the issuance of a search warrant is the totality of the circumstances standard established in *Illinois v. Gates*, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). *See also State v. Gardner*, 741 S.W.2d 1, 7 (Mo. banc 1987), *cert. denied*, 486 U.S. 1025, 108 S.Ct. 2001, 100 L.Ed.2d 232 (1988). In *Gates*, the Supreme Court stated that:

The task of the issuing magistrate is simply to make a practical, common sense decision whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place. And the duty of the reviewing court is simply to ensure that the magistrate had a "substantial basis for ... conclud[ing]" that probable cause existed.

*Id.* 462 U.S. at 238–39, 103 S.Ct. at 2332 (quoting *Jones v. United States*, 362 U.S. 257, 271, 80 S.Ct. 725, 736, 4 L.Ed.2d 697 (1960)).

Substituting the actual information provided by the anonymous caller for the allegedly false information set forth in the affidavit, this court must determine if probable cause existed under the *Gates* standard. Detective Mulloy's affidavit should have represented that the anonymous caller knew Ms. DaVee previously had an airline ticket with Delta but was unsure of what airline she would be using since changing her flight, that Ms. DaVee would be traveling on Friday, Saturday, or Sunday, that Ms. DaVee was "thirty something," and that Mr. B. owns a 1985 Honda automobile. Additionally, this court must consider that Detective Mulloy's investigation revealed Mr. B.'s considerable criminal record, including a prior arrest for attempting to purchase illegal drugs in Florida, and information received by the Drug Enforcement Administration purporting that Mr. B. sold cocaine in Lawrence, Kansas, and used other people to transport drugs from Florida.

The Supreme Court also determined in *Gates* that an officer may rely on information received from an anonymous tip if that information is reasonably corroborated by matters within the officer's knowledge. 462 U.S. at 242–46, 103 S.Ct. at 2334–36. In *Gates*, the Court recognized that the honesty and reliability of an anonymous caller's information regarding alleged criminal activity cannot ordinarily be proven prior to executing a search warrant. However, an officer creates a fair probability that the anonymous caller's information regarding criminal activity can be trusted by corroborating major portions of the anonymous caller's information. *Id.* Additionally, an anonymous informant's ability to predict future events which are subsequently corroborated by an officer's observations lends particular support to the fair probability that the informant's predictions regarding criminal activity are likewise trustworthy. *Id.* at 245, 103 S.Ct. at 2335.

In this case, police officers were able to corroborate substantial portions of the information provided by the anonymous telephone caller. Ms. DaVee had originally planned to travel on Delta Airlines to Kansas City International Airport. Ms. DaVee had changed her travel plans as stated by the anonymous caller. Ms. DaVee was traveling from Fort Lauderdale to Kansas City on one of the three days predicted by the anonymous caller. Ms. DaVee was "thirty-something" and was a white female as indicated by the anonymous caller. Mr. B. met Ms. DaVee at Kansas City International Airport as predicted by the caller. Mr. B. owned a 1985 Honda automobile and was from Baldwin, Kansas, as stated by the anonymous caller. Additionally, Ms. DaVee was traveling from Florida, a well known source of narcotics and other illegal drugs, *see Gates*, 462 U.S. at 243, 103 S.Ct. at 2335, and Mr. B. had a criminal record, particularly a criminal record pertaining to prior attempts to purchase illegal drugs in the State of Florida.

The officer's ability to corroborate substantial portions of the information provided by the anonymous caller, the anonymous caller's ability to predict future events which occurred, and the facts revealed regarding Mr. B.'s criminal past all created a fair probability that the anonymous caller's statements regarding Ms. DaVee's involvement in criminal activity would, likewise, be trustworthy. Thus, under the totality of the circumstances test adopted in *Gates*, probable cause existed for issuing the search warrant. Since, without the allegedly false statements provided by Detective Mulloy, probable cause

existed for issuing the search warrant, Ms. DaVee fails to demonstrate that, under *Franks,* her fourth amendment rights were violated by the officer's alleged false statements purportedly made intentionally, knowingly, or with reckless disregard for the truth.

Ms. DaVee also contends that her fourth amendment rights were violated by the absence in Detective Mulloy's affidavit that his investigation revealed no criminal activity by her. However, an affidavit for a search warrant need only show sufficient facts to support the finding of probable cause. *United States v. Parker,* 836 F.2d 1080, 1083 (8th Cir.1987), *cert. denied,* 486 U.S. 1025, 108 S.Ct. 2002, 100 L.Ed.2d 233 (1988). The *Franks* test for allegedly false information in an affidavit also applies to allegedly omitted statements in an affidavit. *United States v. McNeese,* 901 F.2d 585, 594 (7th Cir.1990). "Omissions of facts are not misrepresentations unless they cast doubt on the existence of probable cause." *United States v. Parker,* 836 F.2d at 1083. In this case, Detective Mulloy's unfruitful investigation to discover any criminal record applicable to Ms. DaVee does not diminish the stated probable cause. For the reasons expressed, the information provided by the anonymous caller, together with the information revealed by the officers' investigation, establish probable cause for issuing the search warrant. Ms. DaVee's first point is denied.

## II

Ms. DaVee next contends on appeal that her constitutional rights guaranteed by the Fourth and Fourteenth Amendments were violated when Kansas City, Missouri, Detectives Mulloy and Pierce applied for the search warrant utilizing the information provided by the anonymous caller. The United States Supreme Court has previously determined that police officers are provided a qualified immunity from liability when applying for a search warrant. *Malley v. Briggs,* 475 U.S. 335, 344 n. 6, 106 S.Ct. 1092, 1097 n. 6, 89 L.Ed.2d 271 (1986). In *Malley,* the Supreme Court held that a police officer will be provided qualified immunity unless his "warrant application is so lacking in indicia of probable cause as to render official belief in its existence unreasonable...." *Id.* at 344–45, 106 S.Ct. at 1098. The question under this standard becomes "whether a reasonably well-trained officer in [this] position would have known that his affidavit failed to establish probable cause and that he should not have applied for the warrant." *Id.* at 345, 106 S.Ct. at 1098. As previously determined, Detective Mulloy's affidavit gave rise to probable cause for issuing the search warrant and the officers are, therefore, immune from liability for their actions in applying for the search warrant under the standard established in *Malley.*

Ms. DaVee also contends that members of the Johnson County, Kansas, Sheriff's Department violated her fourth and fourteenth amendment rights by forwarding the information concerning the anonymous telephone call to members of the Kansas City, Missouri Police Department. The trial court granted the members of the Johnson County, Kansas, Sheriff's Department summary judgments because these officers were entitled to a qualified immunity from liability for their actions in providing the information regarding the anonymous call to the Kansas City, Missouri Police Department.

In *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), the United States Supreme Court determined that "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Id.* at 818, 102 S.Ct. at 2738. This standard, based upon the objective reasonableness of an official's conduct, is intended to permit the government to avoid many insubstantial claims on summary judgment. *Id.* Members of the Johnson County, Kansas Sheriff's Department performed discretionary acts in providing information regarding the anonymous telephone call to the Kansas City, Missouri

Police Department. The United States Constitution does not prohibit a law enforcement agency from providing information, which contributes to establishing probable cause, to a neighboring law enforcement agency. As such, members of the Johnson County, Kansas Sheriff's Department acted in an objectively reasonable manner in providing information to the Kansas City, Missouri Police Department and are entitled to qualified immunity. Ms. Davee's second point is denied.

## III

■ Ms. DaVee next contends that her fourth and fourteenth amendment rights were violated by the manner in which the search was conducted. In particular, Ms. DaVee contends her constitutional rights were violated because the body cavity search was conducted by nonmedical personnel in unsanitary conditions. Although this court has determined that the search warrant was issued upon probable cause, the manner in which the search warrant was executed is also subject to this court's scrutiny. "The conduct of police officers in executing a search warrant is always subject to judicial review as to its reasonableness ... and officers may be held liable under [42 U.S.C. § 1983] for executing a warrant in an unreasonable manner." *Tarpley v. Greene*, 684 F.2d 1, 8–9 (D.C.Cir.1982) (citations omitted). *See also Duncan v. Barnes*, 592 F.2d 1336, 1338 (5th Cir.1979).[1]

The United States Supreme Court considered the constitutionality of visual body cavity searches in *Bell v. Wolfish*, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). In *Bell*, Justice Rehnquist, writing for the Court, held that:

> The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application. In each case it requires a balancing of the need for the particular search against the invasion of personal rights that the search entails. Courts must

consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted.

*Id.* at 559, 99 S.Ct. at 1884. In *Bell*, the Court concluded that visual body cavity searches of detainees were constitutional, *Id.* at 558, 99 S.Ct. at 1884, but warned that such "searches must be conducted in a reasonable manner." *Id.* at 560, 99 S.Ct. at 1885 (citing *Schmerber v. California*, 384 U.S. 757, 771–72, 86 S.Ct. 1826, 1836, 16 L.Ed.2d 908 (1966)).

The particular portion of the *Schmerber* opinion relied upon by Justice Rehnquist in *Bell* creates a link between the reasonableness of a search and the medical qualifications of the person conducting the search. In *Schmerber*, the Supreme Court determined that the extraction of blood from defendant's arm to measure his blood alcohol level was reasonable. 384 U.S. at 771, 86 S.Ct. at 1836. The court, in *Schmerber*, stated:

> [T]he record shows the test was performed in a reasonable manner. Petitioner's blood was taken by a physician in a hospital environment according to accepted medical practices. We are thus not presented with the serious question which would arise if a search involving use of a medical technique, even the most rudimentary sort, were made by other than medical personnel or in other than a medical environment—for example, if it were administered by police in the privacy of the station house.

*Id.* at 771–72, 86 S.Ct. at 1836. Justice Rehnquist's reliance upon this language in *Bell* suggests that some body cavity searches rise to the level of being rudimentary medical techniques and are, thus, unreasonable if conducted by nonmedical personnel.

In *Huguez v. United States*, 406 F.2d 366 (9th Cir.1968), the Ninth Circuit considered the constitutionality of a body cavity search where heroin was extracted from a body cavity of the individual being

---

1. Under Missouri law, officers are also required to execute a valid search warrant in a reasonable manner. *See* § 542.291, RSMo Supp.1990.

searched. *Id.* at 391–92. The court in *Huguez* stated:

> Even when initiation of a body cavity search is justified, of course, excessive or unreasonable techniques may not be used in carrying out such a search. The evidence cited in ... this opinion indicates clearly ... that the search was not improper in terms of the methods used. Of prime significance is the fact that, as was the case with respect to the blood sample in *Schmerber, removal of the heroin was made by a doctor using medically accepted methods.*

*Id.* (Emphasis added.) This language in *Huguez* suggests that searches involving the removal of a foreign object from an individual's body cavity rise to the level of rudimentary medical techniques discussed in *Schmerber* and require the presence of medically trained personnel.

The constitutionality of body cavity searches has also been considered in *United States ex rel. Guy v. McCauley*, 385 F.Supp. 193 (E.D.Wis.1974). In *Guy*, the district court determined that police officers violated an arrestee's constitutional rights when a plastic bag containing heroin was extracted from the arrestee's vagina during a body cavity search conducted by police women. *Id.* at 199. The court in *Guy* recognized that intrusions into or examination of body cavities by skilled medical personnel are routine and acceptable in our everyday lives. *Id.* However, the court concluded that the intrusion into the arrestee's vaginal cavity violated the Fifth Amendment because the search was conducted by a police officer rather than a

doctor or nurse. *Id.*[2] Thus, *Guy* is consistent with the suggestion in *Huguez* that extraction of a foreign object from an individual's body cavity violates the individual's constitutional rights unless conducted by medically trained personnel.

The constitutionality of body cavity searches was again considered in *United States v. Klein*, 522 F.2d 296 (1st Cir.1975). In *Klein*, law enforcement personnel conducted a visual examination of an arrestee's body cavities. *Id.* at 299. However, in *Klein*, no piercing, probing or forced entry beyond the surface of the arrestee's body occurred. *Id.* at 300. The First Circuit determined that the visual body search, without a physical intrusion, did not violate the standard established in *Schmerber* and was conducted in a reasonable manner. *Id.* at 300–01.

■ The cases discussed above provide this court with guidelines for applying the constitutional mandate discussed in *Schmerber*. Body cavity searches must be conducted in a reasonable manner. *Bell*, 441 U.S. at 560, 99 S.Ct. at 1885. Body cavity searches involving a physical intrusion or the extraction of a foreign object from an individual's body cavities, such as those conducted in *Huguez* and *Guy*, rise to the level of rudimentary medical techniques discussed in *Schmerber* and require the presence of medically trained personnel. However, body cavity searches involving only the visual examination of an individual's body cavities, such as the search conducted in *Klein*, are not the type of rudimentary medical techniques discussed in *Schmerber* and nonmedical personnel,

---

**2.** The court's reliance in *Guy* upon the Fifth Amendment instead of the Fourth Amendment is premised upon the Supreme Court's holding in *Rochin v. California*, 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952). In *Rochin*, the Supreme Court determined that the defendant's due process rights, as guaranteed by the Fourteenth Amendment, were violated when a physician pumped his stomach as directed by arresting officers. *Id.* at 174, 72 S.Ct. at 210. The Court determined that such conduct "shocks the conscience" and was offensive to "a sense of justice." *Id.* at 172–73, 72 S.Ct. at 209–10.

The Supreme Court again considered the extent of protection provided by the due process clause in *Breithaupt v. Abram*, 352 U.S. 432, 77

S.Ct. 408, 1 L.Ed.2d 448 (1957). In *Breithaupt*, the Court determined that a due process violation did not occur when a physician withdrew a sample of Breithaupt's blood, without his consent, for alcohol level testing at a police officer's direction. *Id.* at 435, 77 S.Ct. at 410. The Court, in *Breithaupt*, stated "This is not to say that the indiscriminate taking of blood under different conditions or by those not competent to do so may not amount to such 'brutality' as would come under the *Rochin* rule." *Id.* at 437–38, 77 S.Ct. at 412. This language in *Breithaupt* patterns the Court's warning in *Schmerber* that medical techniques of even the most rudimentary sort conducted by nonmedical personnel offend the Constitution.

therefore, may conduct visual body cavity searches without violating an individual's fourth amendment rights.

■ The visual body cavity search in this case did not involve a physical intrusion or extraction of a foreign object. Under the standards set forth above, the visual body cavity search did not violate Ms. Davee's constitutional rights merely because it was conducted by nonmedical personnel. Furthermore, Ms. DaVee failed to present evidence that the room in which the search was conducted presented sufficient unsanitary conditions to rise to the level of being unreasonable under the Fourth Amendment.

■ Ms. DaVee also contends that the visual body cavity search was conducted in an unreasonable manner because the search violated the provisions of § 544.193, RSMo 1986. The statute provides the proper means for conducting a body cavity search of an arrestee. However, Chapter 544 is inapplicable to the execution of search warrants, which is governed by Chapter 542 and contains no similar provisions for conducting body cavity searches. Body cavity searches certainly are humiliating. *Kennedy v. Los Angeles Police Dep't*, 901 F.2d 702, 711 (9th Cir.1989). However, this court will not misconstrue the Fourth Amendment as providing protection more properly left to the legislature's discretion.

The body cavity search in this case was essentially a thorough strip search. No forced entry beyond Ms. DaVee's body surface occurred. The visual, non-penetrating, non-probing body cavity search in this case was not conducted in an unreasonable manner under the Fourth Amendment. Ms. DaVee's third point is denied.

### IV

■ Ms. DaVee next contends that, if the search warrant was valid, the second search, the visual body cavity search, violated her constitutional rights because the search warrant had been fully executed during the first search, the strip search. Ms. DaVee argues that the visual body cavity search was warrantless because the warrant had been fully executed upon completion of the first search. Ms. DaVee also contends that the body cavity search was beyond the scope of the search warrant.

■ Ms. DaVee's argument, in essence, would require that police officers initially conduct a full body cavity search when executing a search warrant or forfeit the ability to subsequently conduct such a search. The officers, in initially conducting the strip search, should not be faulted for attempting to properly conduct the search in such a manner as to avoid unwarranted intrusion into Ms. DaVee's privacy. *United States v. Wuagneux*, 683 F.2d 1343, 1353 (11th Cir.1982), *cert. denied*, 464 U.S. 814, 104 S.Ct. 69, 78 L.Ed.2d 83 (1983). Whether to initially conduct a body cavity search or first thoroughly search the luggage and automobile is, like other matters concerning how best to proceed with executing a search authorized by a valid warrant, generally left to the discretion of the officers executing the warrant. *See Dalia v. United States*, 441 U.S. 238, 257, 99 S.Ct. 1682, 1693, 60 L.Ed.2d 177 (1979). The officers in this case exercised that discretion within the parameters of "reasonableness" established by the Fourth Amendment. *Id.* Additionally, the scope of a search may be as extensive as reasonably required to locate the items described in the warrant. *Wuagneux*, 683 F.2d at 1352. In this case, the items sought, cocaine, could have been concealed in Ms. DaVee's body cavities. Thus, Ms. DaVee's body cavities were within the scope of the search warrant. Ms. DaVee's fourth point is denied.

### V

■ Ms. DaVee also contends that summary judgment is inappropriate because genuine issues of material fact exist. In particular, Ms. DaVee directs this court's attention to the fact that during discovery a transcript of the anonymous telephone call was produced wherein the caller tells Dispatcher Marshall, "It'll be up her dress." Defendants do not deny the existence of this erroneous version of the anon-

ymous telephone call. However, all parties agree that the actual call did not include the statement, "It'll be up her dress." Additionally, the evidence demonstrates that this incorrect version was not seen by Detective Mulloy, Assistant Prosecutor Hahn or the issuing magistrate prior to the search being conducted. The only unanswered question is where this erroneous version of the anonymous call originated. "Material facts are facts that have such legal probative value as would control or determine the litigation." *Schneider v. Forsythe Group*, 782 S.W.2d at 142. Since all parties agree that the version "It'll be up her dress," was not a part of the actual anonymous phone call, was not provided to the Kansas City, Missouri Police Department, and was not set forth in Detective Mulloy's affidavit, the origin of this incorrect version is not a material fact because it does not control or determine the issues discussed above. This point is denied.

## VI

 For her next point on appeal, Ms. DaVee contends that the police officers are not protected by official immunity from liability on her assault claim. Ms. DaVee argues that the officers' actions in executing the search warrant were ministerial acts and subject to liability.

 The official immunity doctrine provides that public officials acting within the scope of their authority are not liable in tort for injuries arising from their discretionary acts or omissions. *Kanagawa v. State*, 685 S.W.2d 831, 835 (Mo. banc 1985). However, public officials may be liable for torts committed when acting in a ministerial capacity. *Id.* This court has already determined that the officers, in executing the search warrant, were performing discretionary acts. *See Dalia*, 441 U.S. at 257, 99 S.Ct. at 1693. The officers are, therefore, protected by official immunity from tort liability for their actions.

 Ms. DaVee also contends the trial court erred in determining that Defendant Barnes, Lewis and Baker, all members of Kansas City International Airport's security staff, were protected from liability pursuant to § 542.291.3. The statute provides protection to individuals summoned to assist police officers in the performance of their official duties and states in part that "[s]uch persons shall not be held liable as a result of the illegality of the search and seizure." This court has already determined that the search did not violate Ms. DaVee's constitutional rights. Thus, the only remaining issue is whether the security staff members are liable for damages under Ms. DaVee's assault claim. The security staff members merely assisted the police officers, as requested, in executing the search warrant and are, therefore, immune from liability pursuant to § 542.291.3.

The trial court's order granting summary judgment to all defendants is affirmed.

All concur.