STATE of Missouri, Respondent,

v.

June Lorene SHERMAN, Appellant.

No. WD 49707.

Missouri Court of Appeals,
Western District.

June 4, 1996.

Motion for Rehearing and/or Transfer to Supreme Court Denied Aug. 27, 1996.

Application to Transfer Denied
Sept. 17, 1996.

Gary E. Brotherton, State Public Defender Office, Columbia, for appellant.

John Munson Morris, John W. Simon, Atty. Gen. Office, Jefferson City, for respondent.

Before LOWENSTEEN, P.J., and HANNA and SPINDEN, JJ.

SPINDEN, Judge.

A jury convicted June Lorene Sherman of second degree murder for the shooting death of her husband, Donald Sherman. On appeal, she challenges (1) the sufficiency of the evidence, (2) the verdict-directing instruction, (3) the circuit court's overruling her motion to suppress, (4) the admission of certain evidence, (5) the court's limiting her cross-examination of her second husband, and (6) the court's refusal to declare a mistrial. We affirm.

Donald and June Sherman were married on December 31, 1988. It was June Sherman's third marriage and Donald Sherman's second. In October 1992, June Sherman wrote her second husband, Joseph Mangum, that her marriage to Donald Sherman had been "a mistake." In October 1992, Donald Sherman told his brother-in-law that his marriage was going badly. He began discussing with his brother-in-law the purchase of their house trailer if he divorced his wife. He also told his brother-in-law that his first wife had taken advantage of him financially and that when he divorced June Sherman, it would be a "50/50 divorce." A month or two before his death, Donald Sherman told his wife that he wanted a divorce. June Sherman opposed a divorce and told her mother-in-law that she was not going to divorce Donald Sherman and let him take half of what she had because she had invested too much in the marriage.

After returning home from work on Friday, May 14, 1993, Donald Sherman ate supper with his wife. Later that evening, an eyewitness saw June Sherman sitting in her husband's pickup with a man at Correll Bot-

toms. During the night, Alberta Gibson, who lived about a mile from Correll Bottoms, believed she heard a gunshot from the bridge at Correll Bottoms. On her way to work around 5:30 the next morning, she noticed a man standing next to Donald Sherman's pickup.

Law enforcement officers discovered Donald Sherman's body at Correll Bottoms on May 16, 1993. He had died from a single gunshot wound in his back. The doctor who performed the autopsy opined that he had died within six hours of eating supper on Friday. A comb found next to Donald Sherman's body was identical to the kind used by June Sherman in her beauty shop. Footprints next to the body matched June Sherman's shoes.

On May 17, 1993, law enforcement officers interviewed June Sherman. After receiving her written consent, officers searched her house. Although they found several firearms, they did not find the gun used to kill Donald Sherman.

Sheriff Richard Freeman and Sergeant Randall King interviewed June Sherman on May 21. She told them that she and her husband went to Correll Bottoms to fish on Friday but returned home because they forgot their bait and remained home the rest of the evening. When Freeman and King told her they had an eyewitness who had seen her at Correll Bottoms Friday night, she told them she had been three and one-half miles north of Correll Bottoms. After further discussion, she said, "Okay, I'll tell you the truth." She said that she and Donald Sherman had returned to Correll Bottoms on Friday evening to set their fishing poles but had returned home at around 9:00 or 9:30. When the officers told her of the footprints, she told them that she had been mushroom hunting at Correll Bottoms the day before she and her husband had gone fishing. The officers told her that it had rained between Thursday and Sunday and that the rain would have washed away her footprints. She then admitted that she had gone to Correll Bottoms on Saturday morning and found her husband's body at 9:00 or 9:30. She said that his stomach was cold and that she "knew he was gone by the look on his face and the

blood." When the officers asked her why she had not reported this to authorities, she answered that she was afraid of "what's happening right now" and that "the family would think [she] did it."

After conferring with the prosecuting attorney, officers arrested June Sherman for Donald Sherman's murder. As the sheriff's personnel were "booking" her, they overheard her tell her daughter, "I didn't do it, but I know who did."

After her arrest, but before her release on bail, June Sherman told her cellmate that she enjoyed television crime shows like "Unsolved Mysteries" because "she could watch them and learn how to kill someone and get by with it." After being released on bail, June Sherman attempted to collect on her husband's life insurance policy for $15,000, but his employer refused to pay her the proceeds. June Sherman told her mother-in-law, who was the second beneficiary on the policy, that if she was convicted, she wanted the mother-in-law to have the insurance proceeds, but that she did not want her husband's daughter or former wife to receive the money. June Sherman also told her mother-in-law that "if you get it, be sure and watch your P's and Q's because you'll be next."

June Sherman did not testify at trial. The jury convicted her of murder in the second degree.

■ In the first of six points, she contends that the circuit court erred in overruling her motion for judgment of acquittal at the close of all the evidence and in sentencing her on the conviction because the state did not present sufficient evidence to convict her. She claims that the state did not present any evidence identifying her as the perpetrator or an accessory.

The state submitted the charge of second degree murder in the disjunctive, allowing the jury to convict June Sherman if it found that she had acted either alone or together with another person in committing the crime. She did not dispute the state's evidence that Donald Sherman died from a single gunshot wound in his back. The question presented is whether the state proved beyond a reasonable doubt that June Sherman, acting alone

or with another person, caused her husband's death. Under § 565.021.1(1), RSMo 1994, a person commits murder in the second degree if he or she knowingly causes the death of another person or, with the purpose of causing serious physical injury to another person, causes the death of another person.

The evidence established that June Sherman had a motive for killing her husband. The evidence showed that the marriage was going badly and that Donald Sherman had told his wife that he wanted a divorce. She did not want a divorce and told her mother-in-law that she would not divorce him. Donald Sherman had a life insurance policy for $15,000 which June Sherman attempted to collect soon after his death. The jury could reasonably infer that June Sherman had a motive to kill her husband.

The prosecutor presented evidence showing that she had an opportunity and means for shooting her husband. She admitted being at Correll Bottoms, where her husband's body was found, on Friday night and Saturday morning. Her footprints were next to his body. She was proficient with firearms. After "finding" her husband's body, she did not report it to authorities until later Saturday night and only at the insistence of Donald Sherman's daughter. She took a round-about route to town after leaving her husband's body. The jury could reasonably infer that she did not want to be seen driving back to town from Correll Bottoms. June Sherman deceived authorities and thwarted efforts to find her husband although she knew his body was at Correll Bottoms.

■ In her second point, Sherman contends that the circuit court erred in overruling her objection and giving Instruction No. 8, patterned after MAI–CR3d 313.04, 304.04 and 304.02. She argues that the state presented no evidence to support a finding that she acted with another to commit the charged offense. She claims this violated her due process rights because it allowed the jury to find her guilty even if it did not find that she acted alone. Instruction No. 8 said:

### INSTRUCTION NO. 8

If you do not find the defendant guilty of murder in the first degree, you must consider whether she is guilty of murder in the second degree.

If you find and believe from the evidence beyond a reasonable doubt:

First, that on or about the 15th day of May, 1993, in the County of Linn, State of Missouri, the defendant or another caused the death of Donald Sherman by shooting him, and

Second, the defendant or another knew or was aware that his conduct was practically certain to cause the death of Donald Sherman,

then you are instructed that the offense of murder in the second degree has occurred, and if you further find and believe from the evidence beyond a reasonable doubt:

Third, that with the purpose of promoting or furthering the death of Donald Sherman the defendant acted alone or acted together with or aided another in committing that offense,

then you will find the defendant guilty of murder in the second degree.

However, unless you find and believe from the evidence beyond a reasonable doubt each and all of these propositions, you must find the defendant not guilty of murder in the second degree.

If you do find the defendant guilty of murder in the second degree, you will assess and declare one of the following punishments:

1. Life imprisonment.

2. Imprisonment for a term of years fixed by you but not less than ten years and not to exceed thirty years.

Sherman claims the circuit court's giving this instruction to the jury was error because the state did not present evidence supporting a finding that she acted with another person.

■ "The purpose of the disjunctive instruction is to give the jury the opportunity to consider evidence that is unclear." *State v. Dulany,* 781 S.W.2d 52, 55 (Mo. banc 1989). Notes on Use 5(c) to MAI–CR3d 304.04 says that the accomplice liability instruction applies when the evidence is not clear whether the defendant acted alone or with an accomplice. "[I]f the evidence is

unclear as to whether another person committed the acts, the disjunctive use is proper because it allows the jury to find that either person committed the act and to also consider evidence that is unclear." *State v. Smith,* 806 S.W.2d 119, 121 (Mo.App.1991).

The state's evidence supporting accomplice liability included June Sherman's admission to her daughter that, "I didn't do it, but I know who did." The state also presented an eyewitness who said that she had seen a man who was not Donald Sherman standing by Donald Sherman's pickup at about 5:30 on Saturday morning after hearing a gunshot from the direction of Correll Bottoms at some point before her alarm clock sounded at 5:00 a.m. The prosecution was not bound by Sherman's self-serving assertions that when she had told her daughter that she knew who killed Donald Sherman, she was referring to an individual whom police later eliminated as a suspect. This was sufficient evidence to raise the question of whether June Sherman acted alone or with another in committing the crime, and the circuit court's instruction was proper.

▇▇▇ Sherman further argues that the trial court erred in overruling her motion to suppress combs and brushes which police seized from her home while searching pursuant to a search warrant. She claims that the search warrant was invalid because it was based on a false affidavit and that the seized items should have been suppressed as "fruit of the poisonous tree."

▇▇ To attack the veracity of a search warrant affidavit in an attempt to void the warrant and exclude evidence, a defendant must make a substantial preliminary showing that the affiant knowingly and intentionally, or with reckless disregard for the truth, included a false statement in the affidavit. *State v. Miller,* 815 S.W.2d 28, 33 (Mo.App. 1991).

During their investigation, officers applied for a search warrant to search the contents of a safe in June and Donald Sherman's house. The application was supported by two affidavits. One by Bobby Hollon, a close friend to Donald Sherman, said that Donald

Sherman had told him that he believed that June Sherman "kept a gun in a safe that was located in the home[.]" The other affidavit, by Sergeant Richard German, said that "in an interview with Bobby K. Hollon in connection with the investigation of the murder of Donald Sherman, [I] was informed that there is a gun in a safe located in the Donald and June Lorene Sherman residence[.]" Officers did not find any guns in the safe.

At the suppression hearing, Hollon indicated that Donald Sherman's belief that a gun was in the safe was based on speculation. German said that Hollon had told him that Donald Sherman "had thought that maybe there may be a gun contained in that safe." He acknowledged that Hollon had not told him with certainty that a gun was in the safe.

June Sherman argues that German made a false statement in the affidavit because it said that, "there *is* a gun in a safe." She claims the officer did this with reckless disregard for the truth because he prepared the affidavit only 30 to 45 minutes after interviewing Hollon. We are not persuaded that Sherman satisfied her burden of showing that German knowingly, intentionally or with reckless disregard for the truth included false information in the affidavit. Even if this were true, both affidavits were submitted to the judge. Both the application for the search warrant and the search warrant itself said that "a gun owned by June Lorene Sherman *may* be located in a safe in the house owned by Donald and June Lorene Sherman at 616 West Wood, Brookfield, Linn County, Missouri, and said gun might be evidence of a crime." [1]

▇▇ The test for determining whether probable cause exists for the issuance of a search warrant is the totality of the circumstances. *DaVee v. Mathis,* 812 S.W.2d 816, 821 (Mo.App.1991). When viewed together, the affidavits provided sufficient information to establish probable cause to issue the search warrant, even excluding the misstatement in German's affidavit.

▇▇ Even assuming *arguendo* that the combs should have been suppressed, their

---

1. We added the emphasis.

admission into evidence was harmless error. This evidence served to establish June Sherman's presence at the crime scene—a fact which she did not dispute. She had already admitted to police that she had discovered her husband's body at Correll Bottoms. Any additional evidence placing her at the crime scene was merely cumulative. *See State v. Pate,* 859 S.W.2d 867, 870 (Mo.App.1993).

■■■ Sherman next argues that the trial court abused its discretion in admitting evidence regarding (1) her experience shooting guns with her former husband and (2) her failure to express outward grief before and after her husband's body was discovered. She claims this evidence was not probative and violated her due process rights and right to a fair trial.

■■■ Determinations of the admissibility of evidence are solely within the trial court's discretion, and we will not disturb these determinations in the absence of a showing of abuse of discretion and prejudice to the defendant. *State v. Sanders,* 903 S.W.2d 234, 237 (Mo.App.1995).

During the investigation, the police recovered several firearms from June Sherman's residence. The state presented the testimony of Sherman's second husband to establish her familiarity with and ability to use firearms. He said that June Sherman was proficient at using guns. Missouri courts have allowed evidence of a defendant's familiarity with using firearms in shooting death cases. *See, e.g., State v. Shilkett,* 356 Mo. 1081, 204 S.W.2d 920, 924 (1947). We find no abuse of discretion.

Sherman also claims that the court should not have allowed testimony concerning her failure to express outward grief before or after her husband's body was discovered. The state presented witnesses, including Donald Sherman's mother and daughter, who testified that June Sherman did not cry after her husband's body was found and that she was smiling when she was told that he had been shot.

Even if this evidence should have been excluded, Sherman fails to demonstrate that she was prejudiced. During cross-examination, the defense elicited testimony from Donald Sherman's daughter that June Sherman was a "nervous" person who had "a habit of laughing inappropriately when things weren't funny." She also presented rebuttal evidence to show that she was "a very self-contained person who kept her emotions to herself." We find no merit in the point.

■■■ Sherman also argues that the trial court abused its discretion when it prohibited her from cross-examining her second husband, Joseph Mangum, regarding the cause of their divorce. The state called Mangum to testify about a letter in which Sherman had expressed a belief that her marriage to Donald Sherman was "a mistake" and about her proficiency with guns. During cross-examination, she attempted to elicit testimony regarding the cause of their divorce. The prosecutor objected on the grounds of irrelevancy. Sherman said that she wanted to show that she had divorced—rather than killed—her second husband after he had an affair with her minor daughter.

■■ A trial court has considerable discretion in determining the relevancy of evidence and extent of cross-examination. *State v. Coats,* 835 S.W.2d 430, 433 (Mo.App.1992); *State v. Garrett,* 813 S.W.2d 879, 882 (Mo.App.1991). This discretion extends to rulings on objections concerning relevancy, materiality, and collateral matters. *State v. Reichert,* 854 S.W.2d 584, 596 (Mo.App.1993). In the absence of a clear abuse of discretion, this court will not interfere with the trial court's ruling on the admission or exclusion of evidence. *State v. Childress,* 805 S.W.2d 729, 730 (Mo.App.1991).

That Sherman did not kill Magnum was obvious to the jury. We fail to ascertain how testimony about his prior misconduct would have any relevant bearing in this case. We find no abuse of discretion.

■■■ Finally, Sherman contends that the trial court abused its discretion in refusing to grant a mistrial after one of her attorneys left the trial because of a family medical emergency. She claims that the court's refusal to grant a mistrial violated her due process rights, right to a fair trial and right

to counsel because the substitute counsel did not have enough time to adequately prepare.

 The declaration of a mistrial is a drastic remedy which should be employed only in extraordinary circumstances. *State v. Madewell*, 904 S.W.2d 66, 67 (Mo.App. 1995). The decision to grant a mistrial is within the discretion of the trial court, and our review is limited to determining whether the court abused its discretion. *Id.* The trial court is in a better position to evaluate the prejudicial effect, if any, on the jury. *State v. Hill*, 906 S.W.2d 420, 424 (Mo.App. 1995).

Jury selection began on May 16, 1994, and opening statements and evidence began the next day. Charles Moreland cross-examined two of the state's witnesses, Rick Freeman and Randy King. The next day, May 18, Sherman's lead defense attorney, Nancy McKerrow, told the court that Moreland had left the trial because of the emergency hospitalization of his wife. McKerrow requested a mistrial. The circuit court asked her if any other attorneys from her office could familiarize themselves with the case and join her if he were to call a recess. McKerrow indicated that if it were necessary, she would have to get another attorney to assist her with the case. The court then asked the prosecutors what their schedule of witnesses would be for the remainder of the trial. After prosecutors advised the court as to their schedule of witnesses, the court asked McKerrow whether Moreland had prepared to cross-examine any of those witnesses. McKerrow indicated that she—not Moreland—had prepared to cross-examine all of the named witnesses. The court then overruled the motion for mistrial but indicated that he would retain the option of granting a mistrial if it appeared to be warranted at some later point.

Later that day, another attorney, Jan Zembles, appeared in court with McKerrow, and they renewed the request for a mistrial which the court denied. The court *voir dired* the jury to ascertain whether any of the jurors knew Zembles. The court adjourned early that day so Zembles would have time to prepare to cross-examine Freeman and King, who the state intended to recall. Before adjourning, the court told the jury:

Ladies and gentlemen of the jury, we're at a stopping point now. The remaining two witnesses of the State will take a little time for new counsel to get acquainted with, need some extra time. Mr. Moreland, his wife—is it toxemia—had to be placed in the hospital and had to deliver prematurely; and he had to be with his wife and therefore it puts the defense a little short handed on counsel; and we need this extra time to give them an opportunity to adequately prepare so, therefore, we're going to recess a little early tonight; but we'll get started in the morning at 9 o'clock.

The trial resumed the next morning, and Zembles cross-examined Freeman and King. McKerrow conducted the direct examination of all defense witnesses and made the closing argument. When the trial court subsequently overruled Sherman's motion for new trial, it found that Sherman's "lead counsel has done an excellent job of representing the defendant and that the substitution of additional counsel in the middle of the trial of Mrs. Zimbles was—did adequately and very good job of taking care of that part of the case that had previously been assigned to Mr. Moreland[.]"

Sherman fails to demonstrate that she was prejudiced by the circuit court's actions. The court made sure that McKerrow had another attorney assisting her the same day that Moreland left the trial. Zembles had observed the first day's evidence, including Moreland's cross-examination of Freeman and King. The court explained the circumstances to the jury and adjourned early so that Zembles would have time to prepare for further cross-examination. Sherman made no complaint in her post-conviction motion that Zembles was ineffective because of her cross-examination of the two witnesses. We find no abuse of discretion.

We affirm the circuit court's judgment of conviction.

LOWENSTEIN, P.J., and HANNA, J., concur.